[No. 31063. *En Banc.* August 1, 1950.]

THE STATE OF WASHINGTON, *Respondent,* v. BURTON JAMES, *Appellant.*[1]

[1]Reported in 221 P. (2d) 482.

*Caughlan & Hatten (Clifford D. O'Brien, Solomon Sachs, and Thomas F. Lynch,* of counsel), for appellant.

*Charles O. Carroll* and *John L. Vogel*, for respondent.

*Edward E. Henry*, *Solie M. Ringold*, *John S. Harlow*, and *Kenneth A. MacDonald*, amici curiae.

BEALS, J.—By information filed August 10, 1948, by the prosecuting attorney for King county, the defendant Burton James was charged with

". . . the crime of WILFUL REFUSAL TO ANSWER PROPER AND MATERIAL QUESTION BEFORE LEGISLATIVE COMMITTEE, committed as follows:

"He, the said BURTON JAMES, in the County of King, State of Washington, on or about the 22nd day of July, 1948, having been duly summoned to attend as a witness before the legislative Fact-Finding Committee on Un-American Activities, a legislative committee of the State of Washington authorized by law to summon witnesses, wilfully refused to answer a material and proper question asked by and under direction of said committee, to-wit: whether he, the said BURTON JAMES, was, or ever had been, a member of the Communist Party; . . ."

The defendant demurred to the information upon the following grounds:

"(1) That the Information does not substantially conform to the requirements of the criminal code;

"(2) That more than one crime is charged and that upon the face of the Information it is impossible for defendant to determine which of said crimes he may be charged with;

"(3) That the facts charged do not constitute a crime; and

"(4) That the Information contains matter which, if true, constitutes a complete defense and legal bar to the action."

The defendant also moved that the information be made more definite and certain, and for a bill of particulars.

By order dated October 22, 1948, the defendant's demurrer was overruled, his motion to make more definite and certain was denied, and his motion for a bill of particulars was granted in part. The state promptly complied with the order directing that a bill of particulars be furnished.

At the beginning of his trial, defendant also moved for a change of venue or, in the alternative, for a continuance, which motions were denied.

Upon the trial, the jury returned a verdict finding the defendant "guilty of the crime of WILFUL REFUSAL TO ANSWER PROPER AND MATERIAL QUESTION BEFORE LEGISLATIVE COMMITTEE, as charged in the Information herein."

Defendant's motion for a new trial, or, in the alternative, for arrest of judgment having been denied, the court, May 20, 1949, signed and entered a judgment and sentence declaring the defendant guilty of the crime charged and directing that the defendant

". . . be punished by confinement in the COUNTY JAIL of the County of King, in the State of Washington, for the term of one month and that he be fined in the amount of $250.00, plus costs."

From this judgment and sentence, the defendant has appealed.

Appellant's proposed statement of facts was filed in the office of the clerk of the superior court August 12, 1949.

Several other persons were charged by information with offenses practically identical with the charge against appellant. These persons have appealed to this court from judgments of guilty, based upon the verdicts of juries in the several cases. By leave of court, four of these persons, including appellant James, filed a consolidated opening brief in connection with their respective appeals. The four appellants on whose behalf the opening brief was filed, join in the first ten assignments of error. Thereafter, each appellant makes certain individual assignments of error, appellant James making five such assignments, which we refer to as appellant's assignments Nos. 11 to 15, both inclusive.

Appellant assigns error (1) upon the denial by the trial court of his motion to dismiss the information and upon the entry of the order overruling his demurrer thereto; (2) upon the denial of his motion for dismissal of the action at the close of the evidence and for a directed verdict of acquittal; (3) upon the court's ruling denying appellant's first offer of proof concerning the alleged nonlegislative purpose of the committee; (4) upon the court's ruling denying appellant's second offer of proof "relating to the necessarily

self-accusatory and self-incriminatory nature of any answer to the question of Communist Party membership in which the information is founded"; upon

"(5) The instructions of the court on the elements of the offense alleged, and the refusal of defendants' [appellant's] proposed instructions;

"(6) The instructions of the court that the Joint Legislative Committee on Un-American Activities was duly constituted and as to its purposes and activities, and the denial of defendants' [appellant's] proposed instructions on this point;

"(7) The instructions of the court that the question involved was a material and proper question, and the refusal of defendants' [appellant's] proposed instructions on this point;

"(8) The instructions of the courts that willful, as used in Rem. Rev. Stat. 2338 means 'deliberate and intentional' and not an 'inadvertence or an accident,' and the refusal of defendants' [appellant's] proposed instructions in willful [*sic*]";

(9) upon the denial of the motions of appellant for a new trial or, in the alternative, for arrest of judgment; (10) upon the court's instruction that appellant was duly and regularly served with a subpoena to appear before the legislative committee; (11) upon the denial of appellant's motions for a change of venue or, in the alternative, for a continuance; (12) upon the refusal of the trial court to receive testimony concerning appellant's "state of mind with respect to the issue of whether his failure to answer constituted willful refusal under Rem. Rev. Stat. 2338, and denial of defendant's [appellant's] special offers of proof"; (13) upon the trial court's instruction that appellant had no constitutional right to refuse to answer a question concerning his present or past membership in the Communist party; (14) upon the trial court's refusal to instruct the jury in accordance with appellant's proposed instructions "on the privilege against self-incrimination and immunity from testifying on that ground"; and (15) upon "prejudicial conduct of the prosecutor and the judge with respect to the offering

and withdrawing defendant's [appellant's] exhibit 14, and the refusal of the court to admit Ex. 14."

After making the assignments of error above referred to, which are printed in the opening brief, counsel proceeds, on behalf of the four appellants, to state "Points" numbered from one to seven inclusive. Each of these points commences with a heading, which headings read as follows:

"Point I. The Committee in Using the Authority of the State Legislature to Compel Disclosure of Private Political Opinion and Association Invaded An Area in Which Governmental Interference Is Forbidden by the First, Fourth and Fifth Amendments to the Constitution of the United States (Article I, Sections 3, 4, 5, 7, 9, and 11 of the Constitution of the State of Washington) As Made Applicable to the State by the Fourteenth Amendment to the Constitution of the United States; and An Area Exclusively Reserved to the People in the Ninth Amendment to the Constitution of the United States (and Article I, Sections 1 and 30 of the Constitution of the State of Washington).

"A. The First, Fourth and Fifth Amendments of the United States Constitution are fully applicable to the activities of this committee, both under the Fourteenth Amendment and under the cognate provisions of the State Constitution, Article I, sections 3, 4, 5, 7, 9 and 11.

"B. The committee's utilization of sovereign power to coerce disclosure of private political beliefs and associations is an invasion of the private rights of individuals and forbidden under the First, Fourth and Fifth Amendments and the cognate provisions of the State Constitution.

"C. The committee's utilizations of legislative power as an agency of government to compel disclosure of private political beliefs and associations is an invasion of the area of governmental power reserved to the people as a whole under Article I, sections 1 and 30 of the Constitution of the State of Washington.

"Point II. The Committee in Conducting the Inquiry Out of Which These Prosecutions Arose Exceeded the Authority Vested in the Legislature As a Whole, and Its Proceedings With Respect to Appellants Were Void, and Appellants Could Not Be Compelled to Answer the Questions Propounded Because (1) the Committee Attempted to Exercise Censorship of Belief, Opinion and Affiliation in General, and Censorship of the Theatre in Particular (2) it Attempted to Punish Appellants and Deprive Them of Liberty

and Property by Means of 'Exposure' and the Establishment of 'Blacklists' in Violation of the Fifth and Fourteenth Amendments and Article I, Section 10 (1) of the United States Constitution and Cognate Provisions of the State Constitution.

"Point III. The Committee in Using the Authority of the Legislature to Compel Witnesses to Declare Whether They Were or Had Been Members of the Communist Party Acted in Violation of the Fifth Amendment (and Article I, Sec. 9, Constitution of the State of Washington) in That It Sought Compulsory Disclosures Which Might Have the Tendency to Criminate the Witness.

"A. A witness before an inquisitorial body may not be compelled to disclose his connection, if any, with the Communist Party.

"B. The appellants were not afforded the opportunity to avail themselves of legal safeguards, such as the Fifth Amendment, in their appearance before the committee.

"C. Privilege against self incrimination is not waived by failure to assert it in precise legal language before a non-judicial inquisitorial body.

"Point IV. House Concurrent Resolution No. 10 Is, On Its Face, and Particularly As Construed and Applied in These Cases, Unconstitutional, in That (1) It Attempts to Delegate to Seven or Less Members of the Legislature a Portion of Sovereign Power, Including Coercive Power, Which Can Reside Only in the Legislature As a Whole and Which Power in the Legislature as a Whole Has Expired With the Adjournment of the Legislature *Sine Die.*

"Point V. House Concurrent Resolution No. 10 (30th Legislature) Is On Its Face, and Particularly As Applied in These Cases So Vague and Ambiguous As To Provide No Ascertainable Standard of Guilt and So Deprives the Accused of Liberty and Property Without Due Process of Law.

"Point VI. The Courts Below Committed Prejudicial Error in the Trial of the Several Defendants in Instructing the Juries That 'Wilful' As That Term Is Used in Rem. Rev. Stat. 2338, Meant Simply 'Intentional' As Distinguished From 'Accidental or Inadvertent.'

"Point VII. The Court Below Committed Other Prejudicial Errors in Rulings and Instructions at the Trials of the Several Defendants.

"A. The Gundlach, Ottenheimer and Burton James cases.

"B. The Ralph Gundlach case.

"C. The Albert Ottenheimer case.

"D. The Rachmiel Forschmiedt case.
"E. The Burton James case."

The arguments under the several "Points" are divided into subheadings, and some of the subheadings are again subdivided by discussions of various questions which counsel deemed pertinent to the appeals.

In appellant's briefs, after the printing of the assignments of error, we find, in the over one hundred twenty pages of argument appropriate to the Burton James appeal, no reference whatever to any assignment of error. The arguments presented by counsel are grouped under the respective "Points," without the slightest coordination with or reference to the assignments of error, the subject matter of several of the assignments being directly or indirectly referred to (without calling attention to any assignment of error) in as many as four or five of the seven "Points" contained in the brief. Apparently, no arguments are presented in support of some of the assignments.

By Rule of Supreme Court 16, 18 Wn. (2d) 17-a, the contents and style of briefs to be filed before this court are stated, subdivision 2 providing, *inter alia,* for the printing of "Assignments of error." Subdivision 5 reads as follows:

"Each error relied on shall be clearly pointed out *and discussed under appropriate designated headings.* Where there are several errors relied on which present the same general questions, they may be discussed together. Whenever error is assigned upon a ruling or decision on the inclusion, omission, sufficiency, or insufficiency of an instruction or instructions, given or not given, such instruction or instructions, as the case may be, shall be set out in the brief in full." (Italics ours.)

Subdivision 5, Rule of Supreme Court 16, was completely ignored by counsel in so far as reference to the assignments of error is concerned.

This appeal being based only upon the formal assignments of error, we endeavor to segregate the arguments and discuss the same in connection with the appropriate assignment or assignments of error presented by appellant James. Naturally, this is a matter of considerable difficulty.

Counsel for respondent undertook to answer appellant's opening brief in the form in which it was written on behalf of appellant and the three other appellants in similar cases, and also answered appellant James' arguments as set forth under the "Points."

By house concurrent resolution No. 10 of the thirtieth legislature of this state (Laws of 1947, p. 1378), it was provided:

"That there is hereby created a Joint Legislative Fact-finding Committee on Un-American Activities in the State of Washington which shall investigate, ascertain, collate and appraise all facts concerning individuals, groups or organizations whose activities are such as to indicate a purpose to foment internal strife, discord and dissension; infiltrate and undermine the stability of our American institutions; confuse and mislead the people, and impede the normal progress of our state and nation either in a war time or a peace time economy; and

"*Be It Further Resolved,* That in addition to other duties imposed upon the committee, the committee shall investigate the activities of groups and organizations whose membership includes persons who are communists, or any other organization known or suspected to be dominated or controlled by a foreign power, which activities affect the conduct of this state, the functioning of any state agency, unemployment relief and other forms of public assistance, educational institutions of this state supported in whole or in part by state funds, or any political program; . . ."

The text of the resolution is contained in our opinion in *State ex rel. Robinson v. Fluent,* 30 Wn. (2d) 194, 191 P. (2d) 241.

The information herein was filed as a result of hearings conducted by the joint legislative committee above referred to (composed of seven members of the legislature), which were held at Seattle, July 19 to July 23, 1948. Appellant was subpoenaed to appear before the committee and, having first been duly sworn, was asked the question:

"MR. HOUSTON: Mr. James, are you or have you ever been a member of the Communist Party? MR. JAMES: I do not care to answer. CHAIRMAN CANWELL: Mr. James, you understand the possible penalties for being in contempt of the

Legislature? MR. JAMES: I stand on my constitutional rights, Mr. Canwell. CHAIRMAN CANWELL: Failure to answer the questions of this committee will be held by the committee as being not responsive—the refusal to testify, and with that understanding in mind I want to ask you again if you are or ever have been a member of the Communist Party? MR. JAMES: I do not care to answer. CHAIRMAN CANWELL: Then step aside, please. MR. O'BRIEN: Will the record show my participation on behalf of this witness was also under the same instructions previously given by the chairman? CHAIRMAN CANWELL: That is correct."

Having refused to testify before the committee, appellant was, by the prosecuting attorney of King county, charged by the information referred to above.

While the matter is subject to argument, we assume, without deciding, that appellant's statement (above quoted) to the chairman of the committee that he stood upon his constitutional rights, was the lawful equivalent of a statement by the witness that he refused to answer the question for the reason that his answer might incriminate him.

 Appellant first assigns error upon the overruling of his demurrer to the information. Apparently, appellant's brief contains no argument in support of this assignment, and, accordingly, we do not consider it. By the same assignment of error, appellant complains of the denial by the trial court of his motion to dismiss the information. This motion was made during the trial, and the trial court did not err in denying the same.

By assignment No. 2, appellant assigns error upon "the rulings of the court denying appellant's motions for dismissal and for a directed verdict of acquittal."

Appellant's brief contains no specific arguments directed to this assignment of error, nor does appellant refer to the same after including it in the list of assignments of error. We find no merit in the assignment.

From the statement of facts, it appears that, just prior to the close of the state's case, appellant's counsel advised the court that two offers of proof, each preceded by a "statement of purposes, with respect to the offer of proof," would be

made. These statements and offers of proof are contained in seventy-one pages of the statement of facts.

Appellant's assignment of error No. 3 is based upon "the rulings of the court denying appellant's offer of proof No. 1, relating to the nonlegislative purpose of the committee." Apparently, appellant's arguments in support of this assignment (without reference thereto) are found under four of the "Points," interspersed with arguments on other questions.

Under this assignment, appellant argues that the course followed by the legislative committee invaded his right of free speech, contending that, while no legislation attempting to abridge the right of free speech is involved, the investigation itself infringes on that right. Appellant's brief contains nothing concerning the subject matter of his offer of proof No. 1, but, from the statement of facts, it would seem that the evidence offered under that heading was for the purpose, *inter alia*, of demonstrating that the question propounded to appellant was not pertinent, material, or proper, "in the respects testified to by the witness Canwell or in any other respect," and that

". . . the Committee's action has indicated so broad a field of inquiry that it is impossible for any citizen summoned before it to determine how or in what respect any question or answer is pertinent, i. e., material or proper."

The remarks of appellant's counsel concerning his offer of proof No. 1 are found on pages 139 to 156 of the statement of facts.

As above stated, the portion of appellant's brief containing arguments completely disregards his assignments of error, but we endeavor to discuss the arguments which seem to be appropriate to the respective assignments of error. The fact that, in the case at bar, we follow the course outlined above shall not be considered as a precedent to be followed in other cases.

In the case of *United States v. Josephson,* 165 F. (2d) 82, the circuit court of appeals for the second circuit considered an appeal by the defendant from a judgment entered by the

district court upon the verdict of a jury finding the defendant guilty of a misdemeanor, under an indictment charging that he had been summoned as a witness by authority of the House of Representatives, acting through its subcommittee of the committee on Un-American activities, and that the defendant had appeared before the committee, but refused to be sworn and testify. Before the circuit court, the defendant attacked the indictment, the sufficiency of the evidence to support the verdict, the trial court's instructions, and the constitutionality of the law authorizing the congressional committee to investigate. On appearing before the committee, the defendant had refused to be sworn and to testify, " 'Until I have had an opportunity to determine through the courts the legality of this committee.' " The circuit court, one judge dissenting, affirmed the judgment from which the defendant had appealed. The supreme court denied certiorari, 333 U. S. 838, 92 L. Ed. 1122, 68 S. Ct. 609.

In *Barsky v. United States,* 167 F. (2d) 241, a case involving proceedings of the same congressional committee referred to in the *Josephson* case, *supra,* the court of appeals of the District of Columbia (one judge dissenting) affirmed the judgment of the district court adjudging the defendants guilty of willful failure to produce records before a committee of the Congress, in violation of a Federal statute. In the course of the opinion, referring to the authority of the congressional committee, the court said:

"We think that even if the inquiry here had been such as to elicit the answer that the witness was a believer in Communism or a member of the Communist Party, Congress had power to make the inquiry."

To adequately discuss the reasoning of the court would greatly extend this opinion. The case is decidedly in point. The supreme court denied certiorari June 14, 1948, 334 U. S. 843, 92 L. Ed. 1767, 68 S. Ct. 1511, and, May 29, 1950, denied a rehearing, 339 U. S. 971, 94 L. Ed. 1379, 70 S. Ct. 1001.

June 13, 1949, the court of appeals for the District of Columbia filed its opinion in the cases of *Lawson v. United*

*States* and *Trumbo v. United States,* 176 F. (2d) 49. The cases were practically identical, and one opinion was written affirming both judgments. The defendants were tried separately before the district court, each for violating a Federal statute making it a misdemeanor to refuse to answer " 'any question [of a Congressional Committee] pertinent to the question under inquiry.' " From the opinion, it appears that the committee on Un-American activities of the House of Representatives, being engaged in an investigation of " 'Communist infiltration of the motion picture industry,' " subpoenaed the defendants to appear before a subcommittee. The defendants appeared and were sworn and, thereafter, testified. Lawson was later tried upon an indictment charging him with refusal to answer a question as to " 'whether or not he was or had ever been a member of the Communist Party.' " From a judgment of guilty, entered upon the verdict of a jury, he appealed. It is not necessary to further consider the *Trumbo* case.

Appellant Lawson urged that, under the constitution, he was protected from being compelled to disclose his private beliefs and associations, and that the questions propounded by the congressional subcommittee were improper, violating the Bill of Rights. The court cited the case of *Barsky v. United States, supra,* and quoted from that opinion as follows:

" '*We hold that* in view of the representations to the Congress as to the nature, purposes and program of Communism and the Communist Party, and in view of the legislation proposed, pending and possible in respect to or premised upon that subject, and in view of the involvement of that subject in the foreign policy of the Government, *Congress has power to make an inquiry of an individual which may elicit the answer that the witness is a believer in Communism or a member of the Communist Party.*' (Emphasis added.)"

The court reaffirmed the *Barsky* case, and adopted the reasoning of that opinion as applicable to the appellants in the cases before the court. The court also quoted from the case of *National Maritime Union of America v. Herzog,* 78

F. Supp. 146 (affirmed 334 U. S. 854, 92 L. Ed. 1776, 68 S. Ct. 1529), as follows:

" 'It is fully established by reiterating holdings of the Supreme Court that the right of free speech is not absolute but must yield to national interests justifiably thought to be of larger importance. The same is true of the right to remain silent. When legislating to avert what it believes to be a threat of substantive evil to national welfare, Congress may abridge either freedom. The right to be silent may be interfered with in either of two ways: as an incident to the accomplishment of a legislative purpose, Congress may require an individual to make a statement specifically prescribed by it; or it may require generally that an individual make any statement essential to avert the anticipated evil, without defining the statement.' "

In the *Lawson* case, the supreme court denied ceritorari, 339 U. S. 934, 94 L. Ed. 548, 70 S. Ct. 663, and denied rehearing May 29, 1950, 339 U. S. 972, 94 L. Ed. 1379, 70 S. Ct. 994.

In the case at bar, appellant's counsel admits, in his reply brief, that the *Lawson* case is in point, but vigorously attacks its reasoning as "erroneous and wrong, for the reasons we have stated." Counsel also criticizes the opinions in the *Barsky* and *Josephson* cases, *supra*.

Appellant's contention that his right of free speech was restricted is without merit.

Appellant next argues that his right to privacy, which he contends is guaranteed by the fourth amendment to the Federal constitution and by Art. I, § 7, of the constitution of this state, was unlawfully infringed by questions concerning his political beliefs.

This argument was urged by the appellant in the case of *United States v. Josephson, supra,* but the court held that the appellant's contention was without merit, saying:

"Surely, matters which potentially affect the very survival of our Government are by no means the purely personal concern of any one. And investigations into such matters are inquiries relating to the personal affairs of private individuals only to the extent that those individuals are a part of the Government as a whole."

See, also, *Sinclair v. United States,* 279 U. S. 263, 294, 73 L. Ed. 692, 49 S. Ct. 268.

Appellant's arguments in support of his assignment of error No. 3 are without merit.

Appellant's fourth assignment of error is based upon:

"The rulings of the court denying appellant's offer of proof No. 2, relating to the necessarily self-accusatory and self-incriminatory nature of any answer to the question of Communist Party membership in which the information is founded."

The record concerning this offer is found in the statement of facts, commencing at page 156 and ending at page 210. The court's ruling refusing appellant's offers of proof is at page 211.

In considering appellant's assignment of error No. 4, we shall also discuss others of his assignments based upon the contention that his rights, under that portion of Art. I, § 9, of the constitution of the state of Washington, which states that "No person shall be compelled in any criminal case to give evidence against himself, . . ." were violated by the legislative committee, in that the committee "sought compulsory disclosures which might have the tendency to criminate the witness."

The questions involving this contention, apparently, are argued by counsel under "Point III" of appellant's opening brief, the argument being stated in three subdivisions. The argument is general, and no assignment of error is referred to therein.

It may be noted that the fifth amendment to the constitution of the United States provides, *inter alia,* that: "No person . . . shall be compelled in any criminal case to be a witness against himself, . . ."

■ Appellant relies upon both constitutional provisions, but it has been held that the provision contained in the Federal constitution does not apply to actions in a state court. *Twining v. New Jersey,* 211 U. S. 78, 53 L. Ed. 97, 29 S. Ct. 14; *In re Huffman v. Smith,* 34 Wn. (2d) 914, 210 P. (2d) 805; *Hunt v. State,* 248 Ala. 217, 27 So. (2d) 186; 8 Wigmore on Evidence (3d ed.) 326, § 2252.

The provision quoted from the constitution of this state affords appellant the same protection that he could claim under the Federal constitution. Decided cases referring to the provision in the Federal constitution are in point in connection with questions concerning the similar provision in the constitution of this state.

Appellant's argument is directed to the proposition that the legislative committee employed the authority of the state legislature in an endeavor to compel witnesses to declare whether they were or had been members of the Communist party, and, in following this course, violated the provisions of the Federal and state constitutions above quoted.

In some of the earlier cases, it was held that the witness was the sole judge as to whether an answer to the question propounded would tend to incriminate him, but this rule has very generally been abandoned.

In the case of *In re Stewart*, 121 Wash. 429, 209 Pac. 849, this court approved the modern rule, as defined in 28 R. C. L. 428 and quoted in the opinion, to the effect that it is, in the first instance, the province of the court to determine, under all the circumstances of the case, whether a direct answer to a question has a tendency to criminate the witness, and that, in connection with the matter presented,

" ' . . . a question that criminates, or tends to criminate, a witness may be defined as one the answer to which will show, or tend to show, him guilty of a crime for which he is yet liable to be punished.' "

Appellant cites the case of *Counselman v. Hitchcock,* 142 U. S. 547, 35 L. Ed. 1110, 12 S. Ct. 195, in which the court held that the constitutional provision applied not only to a criminal case against the witness but also to one called as a witness in any investigation.

We are of the opinion that a witness before a legislative committee enjoys the privilege accorded by the constitution.

By the offers of proof made by appellant and rejected by the court, appellant sought to introduce evidence to the

effect that the Communist party had been "officially described" as an organization advocating the overthrow of the government by force and violence, a conspiracy to subject the national and state governments to the domination of a foreign power, an organization engaged in acts of "treason, sabotage, wrecking, theft and murder," and so forth. Appellant then argues that, the offers having been rejected by the court, the subject matter of the offers must be considered as established, and that an affirmative answer to the question propounded would have connected the witness with a criminal conspiracy.

Appellant cites the case of *State ex rel. Benemovsky v. Sullivan,* 37 So. (2d) (Fla.) 907, in which a witness who refused to answer the question, " 'Are you a member of the Communist Party?' " and other similar questions, was held in contempt and sentenced to serve ninety days in jail. On *habeas corpus,* the judgment appealed from was reversed. In the course of the opinion, the court said:

"The books make a clear distinction between a Communist party and criminal communist party or one engaged in criminal communism. There has existed in this country for many years a communist party which has a national and state ticket in some states but it has never been considered a criminal communist organization. If this was the type of communism that appellant professed, the answer to the questions could not have incriminated her but if as charged in the rule nisi the purpose was to connect her with criminal communist activities then she had a perfect right to decline to answer."

The supreme court of Florida noted that the Communist party, in some states, has a national and state ticket, which is, of course, presented upon ballots in state and national elections.

In 8 Wigmore on Evidence (3d ed.) 356, § 2260, the following text appears in connection with the privilege against self-incrimination:

"It plainly does *not* apply to a fact which merely under *some conceivable circumstances may form part of a crime* (for any fact at all may conceivably do that,—for example, using a copy of the Holy Scriptures in preaching the Gospel,

provided a law against heresy were in force). But it applies (1) to a fact which is *relevant to an inquiry whose sole or essential* object is to *charge a specific crime* upon the claimant; or, (2) to a fact which forms an *essential part of a crime* now desired to be *charged* against the claimant *as a subordinate purpose* in the inquiry; or, (3) though no crime is desired to be charged against the claimant for any purpose whatever, to a fact which *would form an essential part of a crime under certain circumstances,* which circumstances for practical purposes must now be deemed to be true of the claimant."

■ In the case of *Mason v. United States,* 244 U. S. 362, 61 L. Ed. 1198, 37 S. Ct. 621, it appeared that a district court for the district of Alaska had adjudged witnesses in contempt for refusing to answer questions propounded to them upon the ground that answers might tend to incriminate them. In the course of the opinion, the court said:

"The constitutional protection against self-incrimination 'is confined to real danger and does not extend to remote possibilities out of the ordinary course of law.' *Heike v. United States,* 227 U. S. 131, 144; *Brown v. Walker,* 161 U. S. 591, 599, 600."

After citing other authorities, the opinion continues:

"The general rule under which the trial judge must determine each claim according to its own particular circumstances, we think, is indicated with adequate certainty in the above cited opinions. Ordinarily, he is in much better position to appreciate the essential facts than an appellate court can hold and he must be permitted to exercise some discretion, fructified by common sense, when dealing with this necessarily difficult subject. Unless there has been a distinct denial of a right guaranteed, we ought not to interfere.

"In the present case the witnesses certainly were not relieved from answering merely because they declared that so to do might incriminate them. The wisdom of the rule in this regard is well illustrated by the enforced answer, 'I don't know,' given by Mason to the second question, after he had refused to reply under a claim of constitutional privilege."

The judgment of the district court was affirmed.

In *Ex parte Irvine*, 74 Fed. 954, the circuit court, speaking through Judge Taft, granted a writ of *habeas corpus* releasing a person who had been committed for contempt for refusing to answer questions while on the stand as a witness in a criminal case, the court being of the opinion that the witness's plea of privilege was well taken. In the course of the opinion, the court said:

"The great weight of authority, as well as a due regard for the right of the community to have the wheels of justice unclogged, as far as may be consistent with the liberty of the individual, leads us to reject the doctrine that a witness may avoid answering any question by the mere statement that the answer would criminate him, however unreasonable such statement may be. The true rule is that it is for the judge before whom the question arises to decide whether an answer to the question put may reasonably have a tendency to criminate the witness, or to furnish proof of a link in the chain of evidence necessary to convict him of a crime. It is impossible to conceive of a question which might not elicit a fact useful as a link in proving some supposable crime against a witness. The mere statement of his name or of his place of residence might identify him as a felon, but it is not enough that the answer to the question may furnish evidence out of the witness' mouth of a fact which, upon some imaginary hypothesis, would be the one link wanting in the chain of proof against him of a crime. It must appear to the court, from the character of the question, and the other facts adduced in the case, that there is some tangible and substantial probability that the answer of the witness may help to convict him of a crime."

In the case of *McMann v. Securities and Exchange Commission*, 87 F. (2d) 377, the court, speaking through Judge Hand, said:

"The suppression of truth is a grievous necessity at best, more especially when as here the inquiry concerns the public interest; it can be justified at all only when the opposed private interest is supreme."

In the case of *State ex rel. Huff v. Reeves*, 5 Wn. (2d) 637, 106 P. (2d) 729, this court held that the secretary of state was not justified in refusing to place nominees of the Communist party on the ballot for an approaching state election.

The secretary based this refusal, *inter alia*, upon her belief that the avowed purpose of the Communist party included advocation of the overthrow of the state and national governments by force and violence. This court considered the questions presented and held that the refusal of the secretary of state to place the Communist party upon the ballot was without legal justification, and issued the writ of mandate sought by the relator.

■ The record before us does not support appellant's contention that the trial court erred in rejecting appellant's offer of proof No. 2.

We shall now consider two of appellant's assignments of error which are closely related. Appellant's assignment No. 8 reads as follows:

"The instructions of the courts that willful, as used in Rem. Rev. Stat. 2338 means 'deliberate and intentional' and not an 'inadvertence or an accident,' and the refusal of defendants' [appellant's] proposed instructions in willful [*sic*]"

Evidently, the instruction referred to in this assignment is the court's instruction No. 11, which reads as follows:

"You are further instructed that the words 'willfully refused' as used in these instructions do not mean that a refusal to answer a question must necessarily be for an evil or a bad purpose. The reason or the purpose of a refusal to answer is immaterial, so long as that refusal is deliberate and intentional and not a mere inadvertence or an accident."

Appellant James' second individual assignment of error, which we refer to as assignment No. 12, reads as follows:

"The court's refusal to permit testimony of the defendant's state of mind with respect to the issue of whether his failure to answer constituted willful refusal under Rem. Rev. Stat. 2338, and denial of defendant's special offers of proof."

Apparently, both of these assignments of error are discussed in appellant's brief (without reference to the assignments) among the arguments grouped under "Point VI."

Appellant was charged pursuant to Rem. Rev. Stat., § 2338 [P.P.C. § 118-93], which reads as follows:

"Every person duly summoned to attend as a witness before either house of the legislature of this state, or any committee thereof authorized to summon witnesses, who shall refuse or neglect, without lawful excuse, to attend pursuant to such summons, or who shall willfully refuse to be sworn or to affirm or to answer any material or proper question, or to produce, upon reasonable notice, any material or proper books, papers or documents in his possession or under his control, shall be guilty of a gross misdemeanor."

Appellant argues that the word "willful," as used in the statute, means that, in refusing to answer, appellant had a bad or evil purpose.

In this connection, appellant relies upon the opinion of this court in the case of *State v. Shuey*, 107 Wash. 437, 181 Pac. 890. The defendant, a director of a savings and loan association, was charged with violation of a statute regulating such associations, "commanding or prohibiting the doing of many things mentioned in detail," and providing that any officer or employee of " 'any savings and loan association, who shall willfully violate or fail to comply with any of the provisions of this act, shall be guilty of a misdemeanor.' " The defendant was charged, under the statute, with causing the association to declare a dividend upon its stock for a semiannual period, during which the association "had not acquired any net earnings." The defendant was found guilty as charged, but, on his motion, the judgment was arrested on the ground that the facts stated in the information did not constitute a crime, it not being alleged that the defendant had "willfully" violated the statute. On appeal by the state, the trial court's order vacating the verdict was affirmed. This court referred to the charge in the information, noting that, in order to make such conduct criminal, the violation of the statute must have been willful on the part of the person charged,

" . . . for manifestly it is the quality of the act which constitutes the gist of the offense. The distinction between doing an act and willfully doing it rests upon reason and is recognized by the authorities. The elements of *scienter* and

bad purpose are involved and constitute the gravamen of the offense."

The court then cited and quoted from the case of *Potter v. United States,* 155 U. S. 438, 39 L. Ed. 214, 15 S. Ct. 144, in which an officer of a national bank was charged with violation of a Federal statute making it "unlawful for any officer of a national bank to certify a cheque unless the drawer has on deposit at the time an equal amount of money." Another Federal statute imposed a penalty upon one who should willfully violate that statute. It was held that:

"Something more is required than an act of certification made in excess of the actual deposit, *but in ignorance of that fact or without any purpose to evade or disobey the mandates of the law.*" (Italics ours.)

The case of *Spurr v. United States,* 174 U. S. 728, 43 L. Ed. 1150, 19 S. Ct. 812, was also cited, in which the court quoted from the *Potter* case, *supra.*

In *United States v. Murdock,* 290 U. S. 389, 78 L. Ed. 381, 54 S. Ct. 223, the supreme court, on certiorari, affirmed a judgment of the circuit court reversing a judgment of the district court, entered pursuant to the verdict of a jury finding the defendant guilty of violation of the United States revenue acts of 1926 and 1928, which provided for the punishment of a person " 'who willfully fails' " to supply information to the bureau of internal revenue. The court held that the act did not apply to one whose refusal to give the information demanded was based upon a bona fide, though mistaken, understanding of his constitutional protection against self-incrimination. In the course of the opinion the court said:

"Aid in arriving at the meaning of the word 'willfully' may be afforded by the context in which it is used (*United States v. Sioux City Stock Yards Co.,* 162 Fed. 556, 562), and, we think, in the present instance the other omissions which the statute denounces in the same sentence only if willful, aid in ascertaining the meaning as respects the offense here charged."

The court observed that:

"The word often denotes an act which is intentional, or

knowing, or voluntary, as distinguished from accidental. But when used in a criminal statute it generally means an act done with a bad purpose [citing cases]; without justifiable excuse [citing cases]; stubbornly, obstinately, perversely [citing cases]. The word is also employed to characterize a thing done without ground for believing it is lawful [citing cases], or conduct marked by careless disregard whether or not one has the right so to act [citing cases]."

In *Browder v. United States,* 312 U. S. 335, 85 L. Ed. 862, 61 S. Ct. 599, the court referred to the case of *United States v. Murdock, supra,* saying:

"The *Murdock* opinion recognizes, p. 394, that the word 'willful' often denotes an intentional as distinguished from an accidental act."

The *Browder* case involved an offense committed by the unlawful use of a passport wrongfully obtained. In affirming a judgment of guilty, the court said:

"Once the basic wrong under this passport statute is completed, that is the securing of a passport by a false statement, any intentional use of that passport in travel is punishable."

In the case of *Townsend v. United States,* 95 F. (2d) 352, the court of appeals for the District of Columbia affirmed a judgment of the district court, entered upon the verdict of a jury finding the defendant guilty of violation of "section 102, Rev. St., 2 U. S. C. A. § 192," which reads as follows:

" 'Every person who having been summoned as a witness by the authority of either House of Congress, to give testimony or to produce papers upon any matter under inquiry before either House, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, . . . ' "

In the course of the opinion, the court said:

"As was stated in the Murdock Case, *the meaning of the word 'willful' should be separately ascertained, for each statute in which it is used, according to the context in which Congress used it.* It is obvious, we think, that Congress in-

tended there should be willful default if a witness deliberately and defiantly refused to attend a committee hearing because he felt that the committee's attitude was unfriendly or unfair." (Italics ours.)

In the case of *Fields v. United States*, 164 F. (2d) 97, the court of appeals for the District of Columbia affirmed a judgment of the district court finding the defendant guilty of the offense of failing to produce documents before a congressional committee that had directed him to produce the same. On appeal, the defendant complained of an instruction given by the trial court in connection with the matter of good faith on the part of the defendant in his appearance before the committee. In the course of the opinion, the court said:

"The apparent objective of the statute involved here would be largely defeated if, as appellant contends, a person could appear before a congressional investigating committee and by professing willingness to comply with its requests for information escape the penalty for subsequent default. This court said, in *Townsend v. United States*, 1938, 68 App. D. C. 223, 229, 95 F. 2d 352, 358: 'The meaning of the word [willful] depends in large measure upon the nature of the criminal act and the facts of the particular case. It is only in very few criminal cases that "willful" means "done with a bad purpose." Generally, it means "no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law." ' (Quoting Learned Hand, J., in *American Surety Co. v. Sullivan*, 2 Cir., 1925, 7 F. 2d 605, 606.) At the trial of this case the court said, in its charge to the jury: 'The word "willful" does not mean that the failure or refusal to comply with the order of the committee must necessarily be for an evil or a bad purpose. The reason or the purpose of failure to comply or refusal to comply is immaterial, so long as the refusal was deliberate and intentional and was not a mere inadvertence or an accident.' We uphold that differentiation in our view of the purpose of the statute."

Certiorari was denied.

The *Fields* case was cited and followed, as to the construction placed by the court upon the word "willfully," in

*Barsky v. United States*, 167 F. (2d) 241, in which case certiorari was also denied.

In the case of *Dennis v. United States*, 171 F. (2d) 986, the court of appeals for the District of Columbia, in affirming a conviction "for willful failure to respond to a subpoena issued by the House Committee on Un-American Activities," said:

"Appellant strenuously insists (p. 38 *et seq.* Appellant's Brief) that to make out a case of willfulness under the statute it was necessary that the Government be required to allege and prove that the act of refusal shall have been done from a bad purpose or evil motive. Such is not the law. [Citing and quoting from *American Surety Co. of New York v. Sullivan*, 7 F. (2d) 605.]"

The court also cited the cases of *Townsend v. United States* and *Fields v. United States, supra.*

In the case of *American Surety Co. of New York v. Sullivan*, 7 F. (2d) 605, a civil action for damages, the court, speaking through Hand, Circuit Judge, said:

"The word 'willful,' even in criminal statutes, means no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law. [Citing cases.]"

See, also, *Zimberg v. United States*, 142 F. (2d) 132.

In Ballentine's Law Dictionary (1930), pp. 1364, 1365, a number of definitions of the words "willful" and "willfully" appear. We quote two of these definitions:

"Wilfully. When applied to the intent with which an act is done or omitted, the word implies simply a purpose or willingness to commit the act, or the omission referred to, and does not require any intent to violate the law or to injure another. . . . It implies that an act is done knowingly and obstinately and persistently, but not necessarily maliciously.

"Wilful refusal. A refusal that is both intentional and unreasonable is a wilful refusal."

The words "willful" or "willfully" appear in many criminal statutes. In the case of *State v. Shuey, supra*, this court properly held that an information charging the defendant with violation of the statute referred to in the opinion was

defective, if it did not charge that the defendant's violation of the statute was willful, as such an act might have been committed by mistake or because of excusable ignorance of facts, which would be a complete defense against the charge of "willful violation" of the statute. The same is true in connection with the facts in the case of *Potter v. United States, supra.* When considered in connection with different statutes, the word should be construed with reference to the language of the statute in question. *Fields v. United States, supra.*

■ In the case at bar, appellant was charged with "willful refusal to answer" a proper and material question propounded to him, after he had been sworn as a witness before the legislative committee.

It would seem that, under these circumstances, a refusal by the witness to answer a question would be "willful," within the scope of the statute, if the witness heard and understood the question, as it appears appellant did.

Upon the record before us, the trial court did not err in refusing to hear testimony concerning "the defendant's [appellant's] state of mind with respect to the issue of whether his failure to answer constituted willful refusal" under the statute.

The later cases above cited have properly modified the strict construction formerly placed upon the words "willful" and "willfully."

■ By an unnumbered assignment of error, which we refer to as assignment No. 10, *supra,* appellant argues that the trial court invaded the province of the jury by instruction No. 13, which reads as follows:

"You are instructed that under the laws of this State a subpoena to appear before a legislative committee as a witness may be served by any suitable person over eighteen years of age by delivering a copy thereof to the witness.

"And I instruct you further as a matter of law that under the laws of the State of Washington the defendant was duly and regularly served with a subpoena to appear before the Joint Legislative Fact-Finding Committee on Un-American Activities."

By instruction No. 4, the trial court told the jury that one of the elements of the crime with which appellant was charged was:

"That prior to the 22nd day of July, 1948, the defendant was duly summoned to appear as a witness before the legislative Fact-Finding Committee on Un-American Activities of the State of Washington."

Three other elements of the crime were also covered by this instruction.

Appellant contends that, by the portion of the instruction above quoted, the trial court invaded the province of the jury and made an unlawful comment on the evidence.

During appellant's cross-examination, counsel for the prosecution handed the witness a copy of the subpoena, which appellant testified was

" . . . the document that was handed to me by Mr. Stiff or Coleman,—I have forgotten which, when they appeared at my office in the Repertory Playhouse."

In response to a question, appellant then testified: "I appeared at the hearing; yes, sir."

Of course, upon a trial for failure to answer a subpoena, the service thereof would be an important element of the offense alleged to have been committed, but, in the case at bar, appellant appeared before the committee, was duly sworn, and proceeded to testify.

It would seem that an offense such as is stated in the information in the case at bar, might be committed even though the witness had never been served with a subpoena, as, if a witness had voluntarily appeared without being served, and had been duly sworn, and had then refused to answer an appropriate question, the commission of the offense, apparently, would be fully accomplished.

On his trial before the superior court, appellant testified on direct and cross examination at considerable length. No evidence was offered which even intimated that the subpoena in question had not been served upon appellant in due form of law. In the course of his testimony, appellant stated that the subpoena had been served upon him.

We find no merit in this assignment of error.

Appellant assigns error upon the denial of his motion for a change of venue, and upon the denial of his later motion for a continuance.

From the statement of facts, it appears that, when the case was called for trial, counsel presented a motion for a change of venue, based upon the files in the action and upon appellant's affidavit and newspaper clippings attached thereto. The affidavit was to the effect that an impartial trial could not be had in King county due to the publicity given by the newspapers to the action against appellant and similar actions against others.

It further appears, from the statement of facts, that appellant's affidavit in support of his motion, to which the newspaper clippings were attached as exhibits, was before the court, and that a "very extensive argument" was presented, based upon the affidavit and the exhibits. The trial court then denied the motion, stating its reasons for so ruling.

The motion and appellant's affidavit in support thereof, the affidavit incorporating by reference the described items attached thereto as exhibits (which do not appear in the record), are contained in the transcript, but neither the affidavit nor any exhibit in connection therewith is any part of the statement of facts. Due to the absence of the exhibits which the court considered in passing upon the motion, we cannot review the court's ruling on appellant's motion for a change of venue.

So much of the record in connection with appellant's motion as is contained in the statement of facts, shows that the trial court carefully considered the question presented and, in denying the motion, gave its reasons therefor. Nothing in the record even suggests that the trial court erred in denying appellant's motion.

After the motion above referred to was denied, appellant's counsel orally moved for a continuance, which motion the court denied. Appellant also assigns error upon the denial of this motion, but the record contains nothing which

affords any basis for holding that the court erred in its ruling.

■■■ Appellant's last assignment of error is based upon alleged "prejudicial conduct of the prosecutor and the judge with respect to the offering and withdrawing defendant's exhibit 14, and the refusal of the court to admit" that exhibit.

It appears that, late in the trial, the state offered in evidence defendant's exhibit No. 14 for identification, the offer being withdrawn by the state before the court ruled thereon. Appellant then offered the exhibit in evidence. The exhibit consists of a printed volume of over three hundred eighty pages, entitled "Second Report Un-American Activities in Washington State 1948." Counsel for the state interposed no objection to the admission of the exhibit, but the trial court, on its own motion, refused the exhibit, being of the opinion that the exhibit was immaterial and, due to its length, and so forth, would place too heavy a burden on the jury.

Examination of appellant's brief discloses no argument in support of this assignment of error. It appears, however, that the trial court exercised a sound discretion in rejecting the offered exhibit, which was irrelevant to the pending issues.

From now on, we consider appellant's arguments under different "Points" without attempting to attribute the arguments to any particular assignment of error, appellant's brief making no reference to any assignments.

■■■ Under "Point IV" appellant argues that:

"House Concurrent Resolution No. 10 Is, On Its Face, and Particularly As Construed and Applied in These Cases, Unconstitutional, in That (1) It Attempts to Delegate to Seven or Less Members of the Legislature a Portion of Sovereign Power, Including Coercive Power, Which Can Reside Only in the Legislature As a Whole and Which Power in the Legislature as a Whole Has Expired With the Adjournment of the Legislature *Sine Die*."

Appellant attacks the decision of this court in *State ex rel. Robinson v. Fluent*, 30 Wn. (2d) 194, 191 P. (2d) 241, in which this court held that the creation, by concurrent reso-

lution, of the interim committee for purposes of investigation was a valid exercise of legislative authority.

The case cited was heard by this court, sitting *En Banc,* and we adhere to the decision.

Under "Point V," appellant contends that house concurrent resolution No. 10 is void for the reason that it

" . . . Is On Its Face, and Particularly As Applied in These Cases So Vague and Ambiguous As To Provide No Ascertainable Standard of Guilt and So Deprives the Accused of Liberty and Property Without Due Process of Law."

The first and third paragraphs of the resolution read as follows:

"WHEREAS, These are times of public danger; subversive persons and groups are endangering our domestic unity, so as to leave us unprepared to meet aggression, and under cover of the protection afforded by the bill of rights these persons and groups seek to destroy our liberties and our freedom by force, threats and sabotage, and to subject us to the domination of foreign powers; and . . .

"WHEREAS, State legislation to meet the problem and to assist law enforcement officers can best be based on a thorough and impartial investigation by a competent and active legislative committee; . . ."

Other portions of the resolution have been set forth above.

In the case of *Barsky v. United States,* 167 F. (2d) 241 (*supra*), a similar contention was urged against a congressional resolution providing for the creation of a committee to investigate the activities of groups opposed to our form of government as guaranteed by the constitution. The resolution was attacked for several reasons, including a contention that the language of the resolution was too vague to be carried into effect. The court held that the resolution was not defective in form, but, on the contrary, was sufficiently definite and was a valid exercise of legislative authority.

We find no error in the record in connection with the questions last discussed.

We quote the first portion of "Point VII" as found in appellant's brief:

"The Court Below Committed Other Prejudicial Errors in Rulings and Instructions at the Trials of the Several Defendants.

"Under Points I, II, IV and V, *supra,* appellants have shown that the court's instructions on the constitution and purposes of the committee (Appendix II, III, VII, pp. 1, 2, 5 on materiality and propriety of the question involved (Appendix IV, p. 2) and on constitutional rights of witnesses (Appendix IX, p. 7) were erroneous.

"Under these same points, I, II, IV and V, appellants have shown that the court erred in denying defendants' requested instructions on legislative purpose (Appendix XVI to XIII, pp. 15, incl.), on abridgment and limitation of freedom of speech, thought and belief (Appendix XXIV, p. 22), on materiality and pertinency (Appendix XXV and XXVI, p. 23) and on the right not to be disturbed in private affairs (Appendix XXVII to XXX, incl., pp. 25, 26, 27.

"Under Point III, appellants have shown that the court erred in the instructions which were given on privilege against self-incrimination (Appendix IX to XIV, incl., pp. 7, 8, 9, 10, 11 and 12) and on the right of silence, and in denying defendants' requested instructions on this point (Appendix XXXI to XXXIV, incl., pp. 27, 28, 29, 30, 31).

"Under Point VI, appellants have shown that the court erred in its instruction on the meaning of 'willful' (Appendix V, p. ——) and that defendants' proposed instructions (Appendix ing of 'willful' [*sic*] (Appendix V, p. 3) and that XXXV and XLIV, incl., pp. 31, 32, 33, 34, 35, 36, 37) should have been given.

"Under this point appellants discuss other errors in rulings and in instructions or denial of defendants' proposed instructions, applicable to individual cases of the several defendants."

The foregoing quotation from appellant's opening brief shows the complete lack of co-ordination between the assignments of error and the arguments advanced by counsel under the "Points." Matters to which our attention was called by appellant's assignments of error are considered and discussed in this opinion.

Instructions Nos. 1 and 3, as printed in the appendix, are Nos. 4 and 7, respectively, given by the trial court, neither instruction being accurately set forth in the brief. The differences between the two instructions given by the

court, as disclosed by the statement of facts and the transcript, and the same instructions as printed in appellant's brief are not immaterial, nor are they mere printer's errors, such as that found in appellant's brief on page 116, which is quoted above in the paragraph beginning "Under Point VI." It may also be noted that two lines have been added to the court's instruction No. 11 when it appears as No. 5 in the appendix to appellant's brief.

We have examined the instructions as given by the trial court and find that they correctly and adequately advised the jury as to matters concerning which the trial court should have instructed them.

Appellant's assignments of error based upon the court's instructions are without merit.

Appellant assigns error upon the refusal of the trial court to give instructions which appellant requested upon certain phases of the case.

We find no error in the refusal of the trial court to give these instructions or any of them.

Assuming, without deciding, that the form in which appellant undertook to claim his constitutional privilege in refusing to answer the question propounded to him by the legislative committee was sufficient, we find in the record no basis for holding that an answer to the question propounded to appellant might have incriminated him.

The trial court did not err in denying appellant's motion for a new trial or, in the alternative, for arrest of judgment.

Finding no error in the record before us, the judgment appealed from is affirmed.

SIMPSON, C. J., ROBINSON, GRADY, DONWORTH, and HAMLEY, JJ., concur.

HILL, J. (concurring)—The majority opinion correctly disposes of the assignments of error, and I can and do concur therein. But from a realistic point of view, I strongly suspect that the legislative committee, in the *James* and companion cases, asked the question which resulted in the proceedings before us, not for the purpose of securing data

necessary for the framing of legislation to meet the problem of dealing with their subversive activities, but for the harassing effect on political dissidents and for public information. However, one cannot decide cases on suspicion, no matter how strong.

My principal uncertainty in this case centers around the view that the legislature's right to investigate is limited by its power to legislate, and that it is not, as Wigmore points out, a grand jury. 8 Wigmore on Evidence (3d ed.) 80, § 2195. It follows that, if the legislature could enact no valid legislation governing the personal beliefs of an individual, a question compelling the disclosure of such beliefs might not be within the scope of legitimate inquiry. As Mr. Justice Jackson said in the opinion of the court in *West Virginia State Board of Education v. Barnette,* 319 U. S. 624, 642, 63 S. Ct. 1178:

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us."

I do not mean to imply that an individual always has a right to privacy as to his beliefs. If he occupies a position of public trust or confidence, the public might well have the right to compel revelations of such beliefs as are pertinent to the individual's qualifications and suitability for the position held. Certainly the legislature might be concerned with the extent of the infiltration of communists within our educational and governmental institutions; and, as a basis for a determination of whether legislation is necessary to deal with the problem, the legislature might ask public employees whether or not they are communists.

Mr. James occupied no position as a public employee. However, the question asked Mr. James was not, Are you or have you ever been a communist, which would have squarely raised the disturbing question, but was as to his membership in the Communist party. There is a distinction between inquiry as to a man's faith or beliefs, which cannot

be the subject of legislation, and his membership in an organization whose activities, propaganda or otherwise, are subject to legislative scrutiny and regulation.

However, this case does highlight some of the dangers inherent in such legislative investigations, and suggests the importance and necessity of more adequate procedural safeguards. I am concerned lest, in our laudable efforts to combat communism, we give our approval to practices and procedures which may later be used against doctors, lawyers, or union business agents, should some future legislature deem them to be subversive groups, endangering our domestic unity, and a proper object of investigation.

The legislative authorization for any inquiry, if it is to be the basis for fining or sending men to prison for failure to answer material questions, should be sufficiently explicit to enable those who are subpoenaed, and the courts which try them on contempt charges, to ascertain whether a question asked is pertinent and material to the inquiry. The authorization should not be vague and uncertain, or create a roving commission for a fishing expedition. Only by reference to the legislative authorization can a witness determine whether a question asked is or is not material to the inquiry. A copy of such legislative authorization should be served, with the subpoena, on any person whose testimony is desired by a legislative committee.

Moreover, it seems that there should be some means by which a citizen might secure a determination of the limits of the powers of investigation of a legislative committee whose scope or constitutionality is uncertain, without having to subject himself to the embarrassment of prosecution on a contempt charge by refusing to answer questions. Wigmore points out that there must be a strict limitation of the power of the legislature to compel testimony, saying:

"Not only does the logic of the legislative needs call for a strict limitation of this power, but also the policy of the situation; for the Legislatures are not bound by, and do not employ, the evidential rules that in judicial trials protect parties and witnesses and check abuses of power. . . . Moreover, legislative inquiries are sometimes conducted for partisan purposes and personal aggrandizement, and

there is a particular temptation to pursue the inquiry beyond the necessities of contemplated legislation and to assume improperly the function of a grand jury.

"The following limitations may therefore be said to apply: (1) The purpose must be to aid legislation, and that only. (2) The scope of topics is limited to data relevant to that purpose. (3) The power can be exercised by a committee delegated for the purpose; but when such a committee has been designated, the delegated power is limited to the committee acting as such. (4) The Judiciary are entitled to define and declare the limitations of the power." 8 Wigmore on Evidence (3d ed.) 80, § 2195.

MALLERY, J., concurs with HILL, J.

SCHWELLENBACH, J. (concurring)—I concur in the result arrived at by the majority. However, I cannot agree with the assumption of the majority that appellant's statement that he stood upon his constitutional rights was the lawful equivalent of the statement that he refused to answer the question for the reason that his answer might incriminate him; or with this statement: ". . . we find in the record no basis for holding that an answer to the question propounded to appellant might have incriminated him."

The concurrent resolution authorizing the investigation stated:

"WHEREAS, These are times of public danger; subversive persons and groups are endangering our domestic unity, so as to leave us unprepared to meet aggression, and under cover of the protection afforded by the bill of rights these persons and groups seek to destroy our liberties and our freedom by force, threats and sabotage, and to subject us to the domination of foreign powers; and

"WHEREAS, Recent announcements by responsible officers of the federal government indicate the seriousness of the problem, J. Edgar Hoover, Director of the Federal Bureau of Investigation recently said: 'During the past five years American Communists have made their deepest inroads upon our national life. Their propaganda, skillfully designed and adroitly executed has been projected into practically every phase of our national life. The Communist influence has projected itself into some newspapers, books, radio and the screen, some churches, schools, colleges and even

fraternal orders have been penetrated, not with the approval of the rank and file, but in spite of them' . . ."

The question, "Are you or have you ever been a member of the Communist Party?" was relevant to the issue under investigation, and, in view of the testimony given before the committee concerning the activities of the Communist party, an affirmative answer would have tended to incriminate the witness. Whether we approve or disapprove the manner in which the committee conducted the hearings, is beside the point. Our only inquiry is whether or not the question asked was relevant to the investigation being made. There is no doubt but that it was.

Did the witness refuse to answer the question for the reason that his answer might incriminate him? He answered: "I do not care to answer. . . . I stand on my constitutional rights, Mr. Canwell. . . . I do not care to answer." The protection against self-incrimination is not an absolute right, but a privilege which may or may not be invoked by the witness. *State v. Jeane*, 35 Wn. (2d) 423, 213 P. (2d) 633. It is questionable, from appellant's answers, whether or not he studiously refrained from invoking the privilege of self-incrimination. It is clear, however, that he did not refuse to answer on the ground that the answer might incriminate him.

Appellant was asked a question which was relevant to the investigation being made by the committee. He refused to answer and did not invoke the constitutional privilege against self-incrimination. His refusal to answer constituted contempt.

---

October 11, 1950. Petition for rehearing denied.