[Nos. 37216, 37238.   Department One.   March 4, 1965.]

THE STATE OF WASHINGTON, *Respondent*, v. ROBERT THOMAS
DARST, *Appellant.**

*James A. Henry*, for appellant.

*Charles O. Carroll* and *Thomas A. Stang*, for respondent.

HALE, J.—The prosecuting attorney for King County, by
information, accused Patricia Ann Hudson and Robert

*Reported in 399 P. (2d) 618.

Thomas Darst jointly in two counts with unlawfully uttering false or forged prescriptions on April 7 and 8, 1963, for a narcotic drug known as dilaudid. Miss Hudson entered a plea of guilty to count 1 on July 5, 1963, and, pursuant to a deferred sentence granted July 26, 1963, served a jail term and was placed on probation. Thereupon, the court dismissed count 2 against her on motion by the state. Robert Thomas Darst, after Miss Hudson entered a plea of guilty, but prior to the order deferring imposition of sentence, went to trial July 10, 1963, before a jury which returned a verdict of guilty on both counts. From a judgment and sentence of imprisonment for 20 years to run concurrently on each count, he brings this appeal urging 10 separate assignments of error. We have considered each assignment of error and find that they raise three questions requiring discussion.

The first question arises from defendant Darst's timely motion in advance of trial to suppress all evidence obtained from the persons of the two defendants and the automobile used by them, and including all statements made by either of them during the search. He contends that the search, being made without the authority of either a search warrant or warrant of arrest, was also without probable cause and, therefore, unlawful and that all things seized, observed or heard pursuant thereto were inadmissible against him. We think that facts leading to the arrest, search and seizure will bring the applicable law into focus on this question.

At the hearing in advance of trial, the court had before it Darst's affidavit, the affidavit of Miss Hudson adopting Darst's affidavit, and the affidavit of Seattle Police Detective Karl Meyer. It also heard evidence given by Detective Chester G. Sprinkle on direct and cross examination. Detective Sprinkle, whose testimony found substantial corroboration in Detective Meyer's affidavit, said that he had served on the Seattle police department's narcotics detail for about 15 years and earlier as federal treasury agent for 3 years assigned to investigate narcotics violations. He testified that he and Detective Karl Meyer worked together

closely as partners investigating violations of the narcotics laws.

Detective Sprinkle testified he had received information from several persons, particularly from an informant named Willie Arnold, that the defendants had been violating the narcotics laws. He said that he had known Arnold 9 or 10 years and was aware that he was a narcotics user; he stated further that Arnold had given him information concerning narcotics violations numerous times and on the great majority of these occasions such information had proven reliable. About 2 weeks before the arrest and search, Willie Arnold had voluntarily called the officer to tell him that Darst from time to time had drugstore narcotics in his possession and the officer had asked Arnold to keep them informed. Sprinkle said that, at about 8 p.m. on the night preceding the early morning arrest, he and his partner received a telephone call at police headquarters from Willie Arnold, which call the officer described as follows:

" . . . It was related that Mr. Darst and Miss Hudson were in the Savoy Hotel and that Mr. Darst had a quantity of drugstore narcotics, the kind that a citizen couldn't get from a drugstore, they had drugstore labels, and that they were in possession of some forged narcotic prescriptions for Dilaudid, which is a narcotic, and that they would be leaving about 10 o'clock; that actually Mr. Darst was going down to pick up Miss Hudson somewheres around 10 o'clock at her place at the Corona Hotel, and that they would proceed out to some drugstores and pass these forged prescriptions for narcotics, and that they would return back to the Savoy Hotel."

Detective Sprinkle, describing a sequence of events in Seattle, went on to testify that, acting on this information and having earlier obtained a description of Darst's automobile from Willie Arnold, he, Detective Meyer and two federal narcotics agents went to the Corona Hotel at 9 p.m. and observed the car parked at the hotel. About 10 p.m., they saw Darst and Miss Hudson enter the car, drive south on Second Avenue, turn down to First Avenue and then drive to the vicinity of First and Virginia where the officers lost the Darst car in the traffic.

Thereupon the officers separated into teams and took up surveillance at the Corona and Savoy Hotels. At 1 a.m., about 3 hours after losing them in traffic, Sprinkle and Meyer saw Darst and Miss Hudson drive up to the Savoy Hotel and park their car. The detectives drove up right behind the Darst vehicle, alighted, and stepped to the front doors of Darst's car, Detective Meyer on Darst's side and Sprinkle alongside Miss Hudson. Sprinkle says that, as he opened the door for Miss Hudson, he saw an open sack of drugs at her feet. He asked Miss Hudson to step out, told her that she was under arrest without at the time specifying the charges, and proceeded to assist Detective Meyer in searching the automobile.

Behind the front seat panel, they found a forged prescription for dilaudid similar to the other forged prescriptions they had been investigating. They took two bottles of the drug from Darst's trouser pockets and some from Miss Hudson's makeup case, and observed that the sack picked up by Sprinkle when he opened the door of the car contained amphetamines and barbiturates in drugstore containers. Later, at the jail, a search of Miss Hudson's person by the matron revealed a quantity of dilaudid. In denying appellant's motion to suppress all of this evidence, the trial court chose to believe the evidence supplied by Detective Meyer in his affidavit and the testimony of Detective Sprinkle on direct and cross examination.

██ Every crime punishable by death or imprisonment in the state penitentiary is a felony. RCW 9.01.020. Violations of RCW 69.33.380 are felonies, declared so by the provisions of RCW 69.33.410. Possession of forged narcotic prescriptions and of narcotic drugs obtained by uttering them are each felonies. *State v. Boggs*, 57 Wn. (2d) 484, 358 P. (2d) 124; as to a second conviction, see *In re Chapin v. Rhay*, 59 Wn. (2d) 459, 367 P. (2d) 832. If an officer believes *and* has good reason to believe that a person has committed, or is about to commit a felony, he may arrest without a warrant. This is but another way of saying that an officer must have probable cause to believe that a felony has been or is about to be committed and

that the person arrested committed or is about to commit it. *State v. Jack*, 63 Wn. (2d) 632, 388 P. (2d) 566; *State v. Maxie*, 61 Wn. (2d) 126, 377 P. (2d) 435; *State v. Hughlett*, 124 Wash. 366, 214 Pac. 841, similarly as to a citizen's arrest. Even a strong belief held in good faith if unsupported by the circumstances will be insufficient to make a search valid. *Beck v. Ohio*, 379 U.S. 89 13 L. Ed. (2d) 142, 85 S. Ct. 223. The probable cause essential to support an arrest without a warrant is a belief based upon facts within the knowledge of the arresting officer, persuasive enough to convince a judge that a cautious but disinterested man would also believe the arrested person guilty. *State v. Smith*, 56 Wn. (2d) 368, 353 P. (2d) 155; *Henry v. United States*, 361 U.S. 98, 4 L. Ed. (2d) 134, 80 S. Ct. 168; *Carroll v. United States*, 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280, 39 A.L.R. 790.

If the arrest was lawful, *i.e.*, upon probable cause, then a search of the person, the immediate area and the nearby automobile became lawful. *State v. Jackovick*, 56 Wn. (2d) 915, 355 P. (2d) 976; *Preston v. United States*, 376 U.S. 364, 11 L. Ed. (2d) 777, 84 S. Ct. 881 (1964). Such a search incident to a lawful arrest is permitted to protect the arresting officer from assault by accomplices or hidden weapons and to prevent the destruction of evidence. *Preston v. United States, supra.*

In reviewing the facts derived from the affidavits of Patricia Ann Hudson, Robert Thomas Darst, Detective Karl Meyer and the testimony of Detective Chester Sprinkle upon which the trial court found the arrest and search based upon probable cause, *i.e.*, upon reasonable grounds to instill the belief in a cautious man that Darst and Miss Hudson either had possession illegally of narcotics, or forged prescriptions, or both, or had been uttering forged prescriptions therefor, we note a number of telling circumstances affecting the officers' judgment. (1) The officers had been in process of investigating the uttering of forged narcotic prescriptions in the city of Seattle for a period of time. (2) The officers had specialized experience in investigating narcotics violations. (3) Two weeks before the

arrest they received information from an informant—hitherto deemed reliable—that Darst had in his possession the kind of drugstore narcotics that had been stolen or otherwise illegally obtained from various drugstores in the city of Seattle. (4) They requested informant to continue making observations and report further developments. This circumstance eliminates the likelihood of an arrest on a mere hunch or on unsupported suspicion or on sudden impulse. (5) On the night of the arrest, the same informant telephoned the police officers, gave them a description of Darst's car and its license number, and reported that Darst and Miss Hudson were about to set out at 10 p.m. on an expedition to cash in some forged narcotics prescriptions. (6) They went to the Corona Hotel at 9 p.m. where they saw Darst's car, recognizing it from the description and license number given them by their informant. (7) At 10 p.m., just as their informant had predicted, they saw Darst and Miss Hudson drive away in Darst's car. Until they lost sight of the car, neither occupant left it. (8) At 1 a.m., the same two occupants returned to the Savoy Hotel. (9) As Detective Sprinkle looked into the car and asked Miss Hudson to step out, he noticed on the car floor at her feet an open sack containing drugstore type drug containers, and almost simultaneously told her that she was under arrest. We conclude, therefore, that the sum of facts and circumstances within the officers' knowledge show the arrest and search incident thereto were made upon probable cause and on reasonable grounds.

The second question to be dealt with involves the admissibility of Darst's written confession.

On the day of trial, but with all prospective jurors excluded from the courtroom, defendant Darst moved to suppress a purported written confession signed by him while in custody, assigning, as we understand the record, three grounds: That the confession had been taken down without the officers first advising the defendant of his right to counsel; that the officer had coercively mentioned Darst's parole status; and that his request to see counsel had been denied.

At the hearing on the motion, Officer C. F. Kirschner testified that he talked to Darst in presence of Officer Henaby at the interrogation room of the city jail, and that his conversation with Darst was reduced to writing, read by Darst and then signed by him voluntarily, without any promise or threats. He said that he merely mentioned Darst's status as a parolee and did not threaten Darst with parole violations if he refused to sign. He said that Darst at first refused to sign but changed his mind after they had read to him Miss Hudson's confession implicating him.

Officer Henaby corroborated the testimony of Officer Kirschner that no threats or coercion were employed to induce Darst to sign the statement. He said of the defendant, "He made some remark about having counsel, or he had a lawyer," but he was not advised of his right to counsel or that he would not be compelled to sign the statement. He said that the defendant never asked to see an attorney, but merely commented that he had an attorney.

Darst's version differs. He testified that he was locked in an isolation tank at the city jail, and requested the first person to whom he talked, a jailer, to give him a chance to call, or to have an officer call an attorney, naming Mr. Manion. He said that no one called his attorney nor was he given a chance to do so himself. He was not told that he could not be compelled to answer questions, or that his answers could be used against him in evidence. When asked by Officers Kirschner and Henaby for a statement as to what had transpired prior to his arrest, he told them that he did not wish to make a statement until he had seen his counsel, and says that he again named Mr. Manion and gave his office building. He says that the officer read him a statement purportedly signed by Miss Hudson and indicated, without directly saying so, that Miss Hudson's statement would be sufficient to warrant Darst's parole violation. He agrees that no threats other than the implied threat of parole violation were made, nor was he subjected to any threats of physical force or abuse.

That Darst was no novice in police investigations is seen from his admission that he had been convicted of violation

of the Mann Act in 1950 and again in 1955, and in 1959 or 1960 of grand larceny, and in 1958 of third-degree assault in Seattle. He acknowledged that he had been convicted four or five times of Steele Act violations (illegal traffic in liquor), in 1939 of assault and battery in Alaska, and in 1949 of petit larceny in Polson, Montana, and in 1954 of driving while intoxicated in Missoula, Montana. At the time of his arrest in the instant case, he was 45 years of age and had completed 1 year of high school.

█ The court found the confession to have been voluntarily made and not given in violation of defendant's constitutional right to counsel. Abundant evidence supports the trial court's conclusion and demonstrates that the court acted well within its discretion in admitting the confession in evidence. *State v. Hoffman,* 64 Wn. (2d) 445, 392 P. (2d) 237. The essential test is always, Was the confession voluntarily given? *Culombe v. Connecticut,* 367 U.S. 568, 6 L. Ed (2d) 1037, 81 S. Ct. 1860. Appellant points to *Escobedo v. Illinois,* 378 U.S. 478, 12 L. Ed. (2d) 977, 84 S. Ct. 1758, as authority for the position that the confession will be suppressed when the accused has been denied counsel before interrogation and has not been warned either of the right to remain silent or that his statements will be used against him in evidence.

We do not read the *Escobedo* case to make so sweeping and categorical a ruling. Escobedo, while under arrest, repeatedly demanded the right to see his attorney who was then present at police headquarters; they had seen and waved greetings to one another as Escobedo was moved by the police from one room to the other. The attorney requested to see his client several times. The cavalier refusal by the police, conveying, perhaps unintentionally, the idea that the attorney could see his client in custody only at the whim or sufferance of the police, evoked the ruling in *Escobedo, supra.* We would conclude, therefore, that neither *Escobedo, supra,* nor *Haynes v. Washington,* 373 U.S. 503, 10 L. Ed. (2d) 513, 83 S. Ct. 1336, likewise brought to our attention on this point, presents controlling authority here.

Appellant was no inexperienced youth, unknowing in the ways of the world, nor a stranger to the technique of a police interrogation. His numerous arrests and convictions establish this beyond a doubt. He could not help knowing that he could not be compelled to talk to the officers or that whatever he said or wrote might be used against him at his trial. *State v. Self*, 59 Wn. (2d) 62, 366 P. (2d) 193.

The question presented does provide us with an ever-recurring mystery. Why do well-trained, intelligent and seasoned police officers persist in jeopardizing their investigations by failure to give adequate admonition to one in custody under interrogation? It seems to us that a forthright, clearly provable warning given to one in lawful custody informing the accused in unmistakable terms that he has a right to counsel and a right to remain silent, and that anything said or written by him may be used against him in evidence, would do much to eliminate a sizable quantum of claimed error and keep the investigation channeled to its true purpose: ascertaining the guilt or innocence of the party accused. We see no reason for so simple a caveat not being given routinely and required as a part of modern police administration.

Finally, appallent challenged the sufficiency of the evidence, both in a motion to dismiss at the conclusion of the evidence and by motion in arrest of judgment.

Miss Hudson, called by the plaintiff as a witness, testified that, on Sunday evening, April 6, 1963, the appellant came to her, told her that he had some prescription blanks or forms issued by the Department of Labor and Industries and produced the forms. He gave her a wallet containing identification cards and documents, such as an insurance card, driver's license, and other papers carried for personal identification, pertaining to one Bertha Darlene Sands. Darst drove her to a G. O. Guy drugstore, parked nearby, and directed her to go in and "cash" a forged prescription. He entered the store later. She turned in a forged prescription to the pharmacist, and, back in the car, gave the bottle of pills received to Darst.

The following Monday, she said, Darst picked her up at the Corona Hotel and told her that they were to *cash* some more prescriptions. They drove to another drugstore where she said she *cashed* a prescription for dilaudid—a prescription supplied her by Darst. These were the forms used by the Department of Labor and Industries of the State of Washington and contained the forged signature of a doctor.

Our study of the record shows that this evidence, in connection with other evidence, gave the trial court substantial grounds for its ruling that there was sufficient competent evidence to support the verdict and the judgment of conviction. Other errors assigned are without merit and will not be discussed.

Affirmed.

ROSELLINI, C. J., HILL, WEAVER, and OTT, JJ., concur.