[No. 39740.   En Banc.   November 6, 1969.]

THE STATE OF WASHINGTON, *Respondent*, v. BOBBY LEE CREACH, *Appellant*.*

*George F. Velikanje,* for appellant (appointed counsel for appeal).

*Lincoln E. Shropshire, Patrick H. Olwell,* and *F. James Gavin,* for respondent.

WEAVER, J.—Defendant, found guilty by a jury of first degree forgery, appeals from his judgment and sentence. RCW 9.44.020, .060.

The alleged forgery was the signature of the named payee, James S. Black, as an endorsement on a check stolen

*Reported in 461 P.2d 329.

from Mr. Black's automobile on or about August 7, 1966. Other items stolen from the car were a billfold, numerous credit cards, and two suitcases.

August 9, 1966, the Yakima Police Department received a report that an individual was exhibiting credit cards that appeared to be stolen. Pursuant to this report, Officer Leavitt went to the Chinook Hotel where defendant was pointed out by the manager as the individual reported. Officer Leavitt approached defendant and asked for identification documents. Defendant produced a billfold containing numerous credit cards and a driver's license for "James S. Black." Defendant stated that he was Mr. Black and complied with the officer's request that he step outside to answer questions, although he protested that he was waiting for a telephone call.

Outside, Officer Leavitt met Sergeant Qualley and told him he had some difficulty identifying defendant. Answers by defendant to questions concerning his height, weight, date of birth, and color of eyes and hair did not correspond with the information on the driver's license. He was requested to accompany the officers to the police station.

Nothing was said on the ride to the station. While in the elevator, defendant produced a second wallet and volunteered that it contained his correct identification.

At the police station, defendant was interrogated by Detective Sergeant May, who testified that he informed defendant of his constitutional rights by reading the following list to him:

*Preliminary Questions for Recorded Statements*

The date is ............... The time is ..............., room .......... in the Yakima Police Department, Detective Division. Present during this statement:

---

Q. What is your true name?

Q. Your address?

Q. Your age and date of birth?

Q. *Do you understand that you have a right to remain silent?*

*Q. Do you understand that any statement that you make may be used in court against you at a later date?*

*Q. Do you understand that you have the constitutional right to have the advice of an attorney before making this statement?*

*Q. Do you understand that if you do not have the funds to hire an attorney the court will appoint an attorney for you free of charge to you?*

Q. Do you waive these rights?

Q. Do you understand what the word "waive" means?

Q. Is this statement voluntary on your part?

Begin interview. [Italics ours.]

Defendant stated that he did not want an attorney; but we note, he was not advised that he had the right to have an attorney present during the interrogation. Defendant admitted that the "Black" billfold was stolen, and that he was in possession of the other stolen articles. After further questioning, defendant was booked and placed in jail.

August 11, 1966, 2 days later, the police received notice that the endorsement on a check, payable to and drawn by James S. Black, had been forged. Defendant was interrogated again; this time by Detective Sergeant Rutz, who testified that he gave defendant the following explanation of his constitutional rights:

I advised the gentleman that if he wanted to retain an attorney there was a phone and a phone book he could use on my desk, and that if he did not have the funds to hire an attorney, *that if he wound up in court, the court would appoint an attorney for him without cost to him.*

*Q. But did you also tell him that you would not say one more word to him until that attorney arrives?*

A. No, sir. [Italics ours.]

Sergeant Rutz further testified that defendant told him that he was well aware of his rights and indicated that he did not want an attorney. During interrogation, defendant admitted that he cashed the stolen check using Mr. Black's signature and identification.

Pursuant to CrR 101.20W, the trial court determined that defendant had been fully advised of his constitutional

rights prior to making any statement to the officers; that his statements admitting the forgery were voluntary; and that the statements were admissible in evidence.

Defendant makes two assignments of error: first, that it was reversible error to permit Officers Leavitt, Qualley, and May to testify concerning statements made by defendant between the time he was approached by Officer Leavitt at the Chinook Hotel and interrogated by Officer May. Second, it was reversible error to admit the testimony of Officers May and Rutz concerning defendant's statements that he had forged the endorsement; the defendant had not been properly apprised of his constitutional rights.

This appeal brings into sharp focus the applicability of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), to the facts of the instant case.

We disagree with defendant's contention that the testimony of Officers Leavitt, Qualley, and May was inadmissible because he had not been given the *Miranda* pre-interrogation warnings when asked to step outside the Chinook Hotel to answer questions concerning his identity.

The same contention was made in *United States v. Gibson*, 392 F.2d 373 (4th Cir. 1968). Defendant had been asked by a police officer to step outside a tavern to answer questions concerning an automobile. In rejecting this argument, the court said:

> In *Miranda,* the primary concern of the Court was with the "potentiality of compulsion" inherent in in-custody interrogations. The Court spoke of that case as one in which "[a]n individual is swept from [his] surroundings into police custody," "thrust into an unfamiliar atmosphere," held incommunicado, "surrounded by antagonistic forces," and "run through menacing police interrogation procedure." This is not such a case.

> "Custodial interrogation" certainly includes all station-house or police-car questioning initiated by the police, for there the "potentiality for compulsion" is obvious. Whether it also reaches police inquiries made of a suspect on the street or at his own home was left unanswered by the Court and has been much debated. . . . Precise refinements of the terms "custody" and "interrogation" will have to be developed on a case-by-

case basis. Thus, our present task is to determine whether the atmosphere surrounding the brief police questioning on the sidewalk near the car was characterized by "official overbearing" or "overzealous police practices" which, as the Court pointed out, could preclude the individual's making a rational decision whether to speak to the police or remain silent.

This court does not read *Miranda* as requiring officers to preface with a warning all non-coercive questioning conducted in the course of a routine investigation as in the circumstances of this case. [Footnotes omitted.]

It is difficult to set forth an all-inclusive rule covering every possible situation, but once an investigating officer has probable cause to believe that the person confronted has committed an offense, the officer cannot be expected to permit the suspect to leave his presence. At that point, interrogation becomes custodial, and the suspect must be warned of his rights. *People v. Ceccone,* 260 Cal. App. 2d 886, 67 Cal. Rptr. 499 (1968). *See Mathis v. United States,* 391 U.S. 1, 4, 20 L. Ed. 2d 381, 88 S. Ct. 1503 (1968).

In a recent decision rendered after oral argument in the instant case, *Miranda* was deemed applicable to interrogation of a suspect questioned in his bed in his own room by four police officers at 4 a.m. One of the officers testified that the defendant "was under arrest and not free to leave when he was questioned in his bedroom in the early hours of the morning." *Orozco v. Texas,* 394 U.S. 324, 22 L. Ed. 2d 311, 89 S. Ct. 1095 (1969).

*Orozco* does not extend the rules of *Miranda.* It simply applies the rule to a specific factual situation, completely different from the instant case. *Orozco* answers the dissenting opinion.

The questioning of defendant outside the hotel was non-coercive; it did not have the "potentiality of compulsion inherent in the in-costody interrogations." It was conducted during the course of a routine investigation.

It was not a "custodial interrogation," which the United States Supreme Court has defined as

questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived

of his freedom of action in any significant way. [*Miranda, supra.*]

There is no evidence of overbearing or overzealous police officers. Until he was asked to enter the police car, defendant had no reasonable basis to believe that he was under restraint. In fact, Sergeant Qualley testified that had defendant refused to cooperate, he would not have been arrested, but merely kept under surveillance until more information could be obtained. Both officers testified that they did not ask any questions of defendant on the ride to the police station, nor did they ask defendant for the second wallet; he produced it voluntarily.

We find no merit in defendant's first assignment of error.

Arrest, interrogation, and trial of defendant took place subsequent to June 13, 1966, the effective date of *Miranda v. Arizona, supra. See Johnson v. New Jersey,* 384 U.S. 719, 16 L. Ed. 2d 882, 86 S. Ct. 1772 (1966). We must, therefore, consider the impact of *Miranda* upon the facts of the instant case.

■ In general, *Miranda* requires that, prior to custodial interrogation of an accused, he must be warned: (1) that he has the right to remain silent; (2) that any statement he does make can and will be used as evidence against him in a court of law; (3) that he has the right to consult with counsel before answering any questions; (4) that he has the right to have his counsel present during the interrogation; (5) and that if he cannot afford an attorney, one will be appointed for him without cost to him, prior to questioning, if he so desires.

The ultimate question for decision is always: Was the confession or statement voluntarily given? *State v. Darst,* 65 Wn.2d 808, 815, 399 P.2d 618 (1965). *Miranda,* however, indicates that an affirmative answer cannot be supported unless the five warnings listed are given to the accused prior to interrogation.

Defendant contends that the warnings given by Detective May prior to his first interrogation, and the warnings given by Detective Rutz prior to his second interrogation were

inadequate because neither officer informed him in clear and unequivocal terms that he had a right to have a lawyer *present during interrogation;* or that if he could not afford counsel, one would be appointed for him *before any questioning.*

In *Miranda* the court said at 469-70:

The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. *Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today.* Our aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process. A once-stated warning, delivered by those who will conduct the interrogation, cannot itself suffice to that end among those who most require knowledge of their rights. A mere warning given by the interrogators is not alone sufficient to accomplish that end. . . . *Thus, the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires.* [Italics ours.]

The warnings given by the officers do not meet the Miranda test. It was error, therefore, to admit in evidence defendant's statements to Officers May and Rutz that he had forged the endorsement. Our conclusion is fortified by our recent decision in *State v. Tetzlaff,* 75 Wn.2d 649, 453 P.2d 638 (1969), wherein we said:

[T]he right of a known and identified accused to have counsel present at the time of police interrogation is an indispensable part of the protective privilege of the fifth amendment to our federal constitution.

The judgment and sentence is reversed and the case is remanded for a new trial.

HILL, ROSELLINI, NEILL, and McGOVERN, JJ., concur.

HALE, J. (dissenting)—The majority expects too much of police officers. It gives their legal craftsmanship in this case as exhaustive a study, I think, as the bar examiners do to

bar examinations. But regardless of the standards of practice required of police officers in giving legal counsel to persons under arrest, the evidence, I would say, shows that the police performed their duty well. The record establishes that the officers advised the defendant in such abundant detail as to meet all standards, constitutional as well as judicial. I would require no more of them.

In assessing the adequacy of legal advice rendered by police officers to persons under arrest, the courts are obliged to look for some discernible connection between the standards fixed by the courts and the constitutions of the United States and the State of Washington. The United States Constitution says that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. 5. The Constitution of the State of Washington says much the same. Const. art. 1, § 9. If I could find anywhere in the record that the defendant had been compelled to be a witness gainst himself, or even that his confession was otherwise the product of some kind of coercion, I would agree that the conviction should be reversed. My search of the record, however, reveals nothing compulsory or coercive but on the contrary shows affirmatively a voluntary disposition by the defendant to speak out when confronted with damning evidence and admit his guilt.

From what appears to me as abundant evidence, the trial court found not only that defendant confessed voluntarily but did so after receiving a detailed explanation of his rights and privileges relating to self-incrimination. Before asking the questions that elicited the confession, the police officers told the defendant that (1) he had a right to remain silent; (2) any statements he made could be used against him in court; (3) he had the right to the advice of an attorney before making any statement; and (4) looking to his future course, added explicitly. "if you do not have the funds to hire an attorney the court will appoint an attorney for you free of charge to you."

This advice was read to the defendant before he made a confession, but that was not the end of it. He was advised

in even greater detail. At a preliminary hearing held under CrR 101.20W to determine the voluntariness of the confession, Stanley May, sergeant of detectives, after saying that he recited to the defendant a list of the defendant's constitutional rights, testified that he "asked him if he knew his constitutional rights, and he stated that he knew most of them."

The officer then testified:

Q. Did you advise him that he had the right to have an attorney at that time? A. I advised him in order that he had the right to remain silent, that he had the right to call an attorney, that if he did not have any funds that the court would appoint one, that he had a right to remain silent, and that anything that he told me would be used later in court, and that he had a right to waive these rights and that he had the right to talk to me without the benefit of an attorney, and that anything that he would or did tell me would be voluntary on his part.

He said he declined all these and he would tell me what I wanted to know.

Detective May said that he was present 2 days later when Detective Rutz questioned the defendant. Describing Officer Rutz's conduct of the interrogation, Detective May said:

A. The first thing that Detective Rutz did he informed the defendant of his constitutional rights, which took about ten or fifteen minutes. Mr. Rutz was very thorough and went through the whole thing, exactly the same thing as I did two days before. We all have the same form that we use. He was questioning about signing or passing the check at the N B C here in Yakima.

Detective May testified on cross-examination:

Q. Did you ever tell Mr. Creach what the word "waive" means? A. He understood. He knew what the word meant. I believe he said he would set aside—he declined the use of a mouthpiece or attorney. Q. He said what? A. He said he knew what that meant to set aside, and that's when I went into it and I said, "You don't want to call an attorney?" And he said, "That's right." He said, "I'll tell you about it." Q. Did you at any time inform him that this waiver was not permanent? A. I beg your pardon? Q. Well, did you at any time tell him that

by waiving his rights he didn't really waive his rights and that at anytime he wished to go back he could go back and rely on his attorney. A. He was told that, yes, that at any time he wanted to call an attorney he could. Q. Well, did you tell him that or did you read this statement to him? A. Well, I told him that. Q. Outside of the statement? A. Yes. Q. You told him that outside of the statement? A. I told him several things. Q. You told him something outside of the statement? A. I told him several things outside of the statement. Q. What else did you tell him other than reading the statement to him? A. Well, I told him that—as I recall, I told him all the things that are on there, plus that the phone was on the desk, and that he could call an attorney, anyone of his choosing. I told him it was voluntary. I told him that everything was voluntary and anything he said was voluntary, and I believe that's about it. Q. In other words, outside of the statement, you told him that the phone was on the desk and he could call an attorney. A. And the telephone directory was right there, and a list of local attorneys was in the book. And he informed me that he didn't know anyone in Yakima. Well, he didn't know an attorney, that's what he said. Q. Did you tell him that you would assist him in getting an attorney? A. No, I did not.

Q. At any time during the interrogations or taking a statement did you inform him again of these rights? A. The only time—I informed him of his rights prior to the interrogation and he was informed later by Detective Rutz.

Officer Rutz testified:

A. I referred to Mr. Creach, I advised him about his constitutional rights. Q. And what rights did you advise him of? A. I advised Mr. Creach that he did not have to talk to me if he felt that he did not want to, that he did not have to talk to me without the advice of counsel or without counsel present, and if he wanted counsel, the telephone was sitting on my desk, the telephone book was on the desk. He could utilize that. He could call an attorney if he so desired. Q. Did you then have a conversation with him? A. Yes, I did. Q. What did he say about your advising him of these things? A. Mr. Creach stated to me and informed me that he was well aware of his constitutional rights. Q. Did you promise him anything or threaten him with anything to talk to you, to get him to talk to you? A. No, sir, I did not. Q. Did you offer to

work any deals for him if he told you what took place? A. No, sir, I did not. Q. And what did Mr. Creach tell you specifically at this time? A. I beg pardon? Q. What did Mr. Creach tell you at this time? A. Mr. Creach stated to me that he would talk to me.

Officer Rutz then said that he showed Creach the check, and Creach told him he had endorsed and cashed that particular check at the National Bank of Commerce in Yakima. This was the check that the state proved to everyone's satisfaction that it was a forgery.

Further, concerning advice given to the defendant by the Yakima police, Officer May testified:

A. Well, I went down a list of rights that is always or that I always inform a person that he has, and I informed the defendant that he had a right to an attorney prior to making any statement to me and that anything he made to me—or that any statement he made to me could be used against him in court at a later date. I informed him that he had a right to counsel. Also, that if he didn't have any funds the court would appoint an attorney for him. I informed him that anything he told me would be voluntary and the—MR. VELIKANJE: Excuse me, did you say he said that or you said that? A. I told him that anything that he told me would be voluntary on his part. MR. VELIKANJE: I see. All right. A. And he had a—I believe I repeated or stated he had a right to remain silent, and I also told him he had a right to waive all of these rights and that he could talk to me of his own free will. I believe that was about it.

But again this was not the end of the legal advice as shown by the record. Officer May said that he was present and heard Officer Rutz expounding the law of constitutional and judicial immunities to the defendant as follows:

A. Detective Rutz introduced himself first and told him that anything he told us could be used in court at a later date. He told him he had a right to counsel or an attorney, and directed his attention to his telephone and telephone directory on his desk, and told the defendant that he could get any attorney of his choosing and he pointed out that if the subject would be taken to court that the court would appoint one for him at a later date if he could not afford one, and I believe he—basically the

same thing that I told him. It took him about—he has his own style of talking to these people and it took him about fifteen minutes to go through this.

After the court had ruled that the admission and confession were admissible, Officer Rutz testified, again on direct examination:

A. I advised Mr. Creach that he didn't have to talk to me if he did not care to, if he did not want to discuss this matter. If he wanted to consult with an attorney, the telephone directory was on my desk and it was available for his use, and he could consult an attorney, and he could have an attorney present at the office while I was talking to him, and if he didn't have the funds to hire an attorney and in the event should this matter come to court, the court would appoint an attorney for him without any cost to him. Q. Did you advise him of anything else at this time, that you recall? A. No, not offhand not right now, no, sir. Q. Did you threaten him at any time? A. No, sir. Q. Did you promise him anything? A. No, sir.

Detective May in his testimony described how, after the defendant had been advised in detail several times, he at first denied cashing the forged check and then admitted cashing it at the bank:

A. Well, with the black vest-type billfold opened there was numerous credit cards with the name James Black, and I also had this other billfold with the name of Mr. Creach, and I also questioned Mr. Creach how he got hold of this billfold and he first started by telling me that he was employed in Idaho, and he explained the type of employment, and he stated where he was working was near a resort area or was a resort area and that he and another person which he would not name or describe to me were near some parked cars near a resort area, and this one particular car was broken into and immediately after this car was broken into he received the identifications of Mr. Black. . . . A. In the course of the interrogation, the first part, Mr. Creach denied being in the bank and denied cashing it. In about fifteen minutes or twenty minutes after—now, this is a guess, I'd say within fifteen or twenty minutes after Detective Rutz questioned him he produced the check and affidavit of forgery, and he Mr. Creach told Rutz and myself that he

went into the N B C and he passed the check using Mr. Black's Washington State Driver's license.

Creach did not testify on his own behalf before the jury, but at the hearing under CrR 101.20W, RCW vol. 0, to test the admissibility of his confession, he said:

Let me see, then Detective May he come back in and asked me what my name was, and he had the billfold. He said, "You don't have to talk to me." He said, "You can call an attorney." He said, "We have reports from—I believe he said—"from Idaho that these credit cards were stolen, and also that you was wanted in Idaho for burglary."

Further, said the defendant:

A. I believe it was Rutz's office. And Mr. Rutz told me that I didn't have to talk to him and that I could call an attorney, that the telephone was on the desk, and I said, "Well, I don't think I need an attorney." And somewhere along the line they asked me about a burglary that was committed here I think on the 7th of August, and I told them that I did not know anything about a burglary in Yakima because I just arrived in town, and at some place they brought that check out. He said, "Did you ever see this?" And I said, "I don't know." And they said, "Did you sign it?" And I said, "If I signed the check I would never admit it."

and went on, still in direct examination:

Q. Tell me exactly what he said when you were in his office on August 9th? A. He told me that I didn't have to talk but I could call an attorney. Q. Did he tell you that anything that you might say could be used against you in court? A. No. Q. Did he say if you couldn't afford to hire an attorney he would get one for you? A. No, he did not. Q. Did he read anything to you from a sheet of paper? A. No, I couldn't say positively. Q. You mean you don't remember? A. No, I don't remember. Q. Can you tell me exactly what Mr. Rutz said to you? A. He said—he introduced himself and he said, "I'm in charge of the forgery detail," and he said, "You don't have to talk to me. You can remain silent." He said, "You can call an attorney. The phone is on the desk." Q. Did he say anything that you might say would be used against you in court? A. Yes.

The defendant thus admitted that he knew of his right to remain silent and that anything he said could be used against him in court, but denied that he was told the court would appoint a lawyer for him if he was without funds. However, when interrogated by the court, he answered as follows:

THE COURT: Did they threaten you to do you bodily harm if you did not talk to them? A. No. THE COURT: Did they hold you for a long time or have any strong lights on you, or anything like that? A. Well, no, no strong lights. They put me in a cell by myself. THE COURT: I know, but was your will so that you couldn't refuse to talk to them? When they told you, "You can remain silent, if you want to"—They told you that, didn't they? A. Yes. THE COURT: Did you feel that you could then remain silent if you wanted to? A. Yes. THE COURT: Did they in any way say that you must make a statement? A. No. THE COURT: Either in words or action? A. No. THE COURT: In other words, whatever you told them—you dispute what you told them—but whatever you told them was purely voluntary on your part, is that right? A. Well, the questions they asked me was purely partially — THE COURT: Well, I know but did you talk voluntarily? A. Yes. THE COURT: Nobody forced you to talk? A. No.

On cross-examination at the pretrial hearing, Creach admitted that he had been convicted and sentenced to 5 years' imprisonment for grand larceny in 1943; sentenced in 1947 to 5 years' imprisonment for burglary; and, in 1949, convicted of another felony and sentenced to 15 years' imprisonment; and, in either 1958 or 1959—he could not be certain of the year—sentenced to the Michigan State Penitentiary at Lansing for 5 to 10 years for second-degree burglary and forgery.

The court was well within its discretionary power, I think, in not according to Mr. Creach the highest degree of credibility, and it is not for a reviewing court to believe Mr. Creach's testimony and disbelieve the other witnesses. In my opinion, the court had no choice but to admit the defendant's confession and admissions against interest as voluntary, competent, and material under every conceivable constitutional theory or rule of evidence and even under

the most expanded and ethereal interpretation of *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).

In a record about one half of which appears to be devoted to a palaver among court, counsel and witnesses concerning advice to the accused to remain silent or to consult an attorney or to speak up if he wished and the remainder devoted to substantive proof of the crime charged, the evidence is overwhelming that the defendant's confession was voluntary and that he knowingly waived his right to remain silent. The incriminating statements and confessions were admissible, I think, both under the *Miranda* decision and the state and federal constitutions and under what I deem the time-tested, long-held rule of the American common law now codified for the federal judiciary under *Witnesses and Evidence* 18 U.S.C. § 3501 (1969), as follows:

(a) In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

(b) The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant

was without the assistance of counsel when questioned and when giving such confession.

The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

I would, therefore, affirm.

HUNTER, C. J., FINLEY and HAMILTON, JJ., concur in the result of the dissent.