[No. 41255. En Banc. May 20, 1971.]

THE STATE OF WASHINGTON, *Respondent,* v. WILLIE CARROLL PARKER, *Appellant.*

*Newsum & Herman* and *J. Hartly Newsum,* for appellant (appointed counsel for appeal).

*Charles O. Carroll, Prosecuting Attorney,* and *Michael P. Ruark, Deputy,* for respondent.

HALE, J.—Officers Tando and Eggers were on routine patrol in West Seattle, April 3, 1969, when, at about 7 p.m., they received a police radio broadcast of a robbery at the Wigwam Store at 23rd and East Madison in Seattle. Because Spokane Street, a main thoroughfare, would be a ready route from the scene of the robbery to West Seattle, the officers drove at once to 12th Avenue Southwest and Spokane Street. Later radio messages amplified the initial information and descriptions and informed them to look for a Negro male, age 25 to 35, of average size—5 feet 8 inches to 6 feet in height—carrying a black, small caliber pistol with pearl or light-colored grips, and wearing a gold or yellow light-colored jacket or sweater and a checkered bill-type cap, and riding in or driving a 1953 to 1955 red-over-white Dodge car.

About 14 minutes after the first message, they saw a red and white 1955 model car which they thought to be a Dodge—but which turned out to be a Chrysler—moving west in the stream of traffic on Spokane Street. Defendant was driving; alongside him crouched slightly was James E. Drew, a Negro, who appeared to be within the 25-35 year age group and wearing what appeared to be a gold-colored sweater or jacket. The officers followed the car for a few blocks and then signaled it to pull over and stop. Believing this to be the vehicle involved in the holdup, they searched the two occupants and the vehicle.

In the glove compartment, the officers found a black, 22-caliber revolver with pearlized plastic grip which the de-

fendant said was his. On the floor of the back seat they found a brown canvas bag referred to as an "AWOL" type bag which neither the defendant nor his passenger, Drew, would admit to owning. Inside this bag was a bill-type checkered wool cap, a yellow zipper jacket, a toy pistol and a quantity—10 to 15 rounds—of 22-caliber ammunition. Some of these bullets and all of those in the revolver had the ends snipped off, a procedure which the defendant, in acknowledging their ownership, said that he had done because they were .22 "longs" and the revolver would take only "shorts." The officers found about $430 in bills in one of Drew's boots and a pair of yellowish-tinted sunglasses in defendant's inside coat pocket. The store cashier who had been robbed testified that the man who robbed her had been wearing sunglasses with yellowish-tinted lenses.

Charged jointly with armed robbery, Drew pleaded guilty; the defendant went to trial, was convicted and now appeals. He directs his first assignment of error to the court's refusal to suppress the evidence obtained in the search of his vehicle. Throughout the arrest and trial, the defendant asserted his innocence. He said that Drew had met him at the Wigwam Store parking area and requested a ride, that he had no knowledge whatever that Drew intended to or had committed a robbery at the Wigwam Store, and that the officers had no probable cause to stop his vehicle, search it and him and place him under arrest.

Probable cause derives from a composite of facts, circumstances and judgment. Probable cause for an arrest without a warrant arises from a belief based upon facts and circumstances within the knowledge of the arresting officer that would persuade a cautious but disinterested person to believe the arrested person has committed a crime. *State v. Darst,* 65 Wn.2d 808, 399 P.2d 618 (1965); *Henry v. United States,* 361 U.S. 98, 4 L. Ed. 2d 134, 80 S. Ct. 168 (1959). The officer need not have knowledge or evidence sufficient to establish guilt beyond a reasonable doubt, for in this area the law is concerned with probabilities arising from the facts and considerations of everyday life on which pru-

dent men, not legal technicians, act. *Brinegar v. United States*, 338 U.S. 160, 93 L. Ed. 1879, 69 S. Ct. 1302 (1949); *State v. Ellison*, 77 Wn.2d 874, 467 P.2d 839 (1970). Expressed another way, "Proper cause for arrest has often been defined to be a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty." *State v. Todd*, 78 Wn.2d 362, 365, 474 P.2d 542 (1970).

█ The combination of facts and circumstances arising from the time and location of the robbery at the Wigwam Store at about 7 p.m., the description of a 1953 to 1955 red-over-white Dodge as a getaway car, the description of the robber and the appearance of a passenger in the described automobile, all answering some of the described characteristics at a place where ordinary speed would take the car in the elapsed time, combine, we think, to give the officers in the exercise of prudent judgment good reason and probable cause to stop the car and search its occupants. The search of an automobile pursuant to a lawful arrest is constitutional and the evidence seized in the search is and in this case was admissible. *Chambers v. Maroney*, 399 U.S. 42, 26 L. Ed. 2d 419, 90 S. Ct. 1975 (1970).

Defendant next challenges the Fifth Amendment claim of immunity from compulsory self-incrimination asserted when defendant's counsel called James Drew as a witness for the defense. Drew, who had pleaded guilty to and had been sentenced for the robbery for which the defendant was being tried, had at defendant's request been ordered transferred by the trial judge from the Shelton Correctional Institution so as to be available as a witness. On arrival at the King County jail, Drew was allowed first to interview his own attorney, Mr. Murray Guterson, who appeared in court with him and agreed to remain in the courtroom in event the defendant called Drew as a witness. In the absence of the jury, obviously referring to the Fifth Amendment, Mr. Guterson told the court that he had advised the witness he should "not be a witness either for

the defendant or against the defendant or for the State or against the State" if within his constitutional rights to remain silent. Defendant's counsel then urged, as he now does, that, since the witness had already pleaded guilty to and was under sentence for the charge upon which he was to be examined, he was no longer in jeopardy and he could not properly claim immunity under the Fifth Amendment. After interviewing Drew, counsel for the defendant stated to the court:

> I am somewhat in a difficult position here. The defendant says he does not want to call Drew as a witness and my judgment is that Drew should be called as a witness for the defendant, if he is not called by anybody else.

Counsel then added he felt "justified in calling Drew as a witness for him against the defendant's wishes on the grounds I am in charge of this trial" and would proceed on that basis. When the court asked the defendant if he wished Drew to testify, he replied, "I explained to the attorney that I didn't. I explained to him the reasons why." Defendant's attorney, nevertheless, feeling it his duty as defendant's counsel to do so, called James Drew to the witness stand as a witness on behalf of the defendant in the latter's case in chief.

Drew answered more than 25 questions put to him by defendant's counsel, all preliminary in character. After this preliminary questioning, and next following Drew's first claim of immunity under the Fifth Amendment, Mr. Guterson, representing the witness, said that he had advised Drew to decline to testify on the grounds of self-incrimination; that such testimony could subject the witness to a charge of some form of conspiracy; and that physical evidence had been obtained in the search of the canvas bag found by the officers in the car at the time of the arrest which could lead to a prosecution of the witness on another and different crime entirely.

Thereupon the witness claimed the Fifth Amendment, as follows:

> Q. Where did you first meet Robert Louis on the 3rd of

April of this year? The day this Wigwam robbery was pulled? A. I plead my Fifth Amendment. Q. What? Q. Did you see Robert Louis at the Wigwam store on the 3rd of April of this year? A. I plead my amendment. Q. Did you rob the Wigwam store at 23rd and Union on the 3rd of April of this year? A. Yes. Q. Did you use any gun to rob it? A. I plead my amendment. Q. Did Robert Louis take any part in this robbery? A. I pleads the Fifth Amendment. Q. Did you let Robert Louis know you were going to rob the Wigwam? A. I plead the Fifth Amendment. Q. Whose pistol was it? A. I plead on the Fifth Amendment. Q. What kind of a pistol was it? A. I plead on the Fifth Amendment. Q. Have you seen anything that appeared like State's Exhibit 7 or State's Exhibit 5 before? A. I plead on the Fifth Amendment. Q. So far as you know when did Louis first find out about the robbery? A. I plead on the Fifth Amendment. Q. Do you know if there were any bullets in the overnight bag? A. I plead on the Fifth Amendment. Q. At the time of the robbery did you have sun glasses with you? A. I plead on the Fifth Amendment.

Defendant's claim of error is directed to the court's refusal to compel the witness Drew to answer the questions, citing *State v. Nelson,* 65 Wn.2d 189, 396 P.2d 540 (1964) and 72 Wn.2d 269, 432 P.2d 857 (1967). The court, we think, acted within its discretionary powers in sustaining the witness' Fifth Amendment claim against self-incrimination.

Every person within the jurisdiction of a court of competent jurisdiction—with a few exceptions related to the office of the chief executive—owes a duty when summoned by the court to come forward and speak the truth. It is a duty which may be enforced by imprisonment, fine and the imposition of other judicial sanctions. Without the power to compel witnesses to testify, trials would be reduced from a quest for the truth in the most momentous affairs of life to pointless and inconclusive debates and the judicial systems would face inevitable extinction.

Opposed to this power to compel the giving of evidence stands the Fifth Amendment declaring that no person "shall be compelled in any criminal case to be a witness against himself," adopted against the inquisitorial methods

of the ecclesiastical courts, then of recent memory, and the power then exercised by the common-law courts of England requiring accused persons to be examined in open court. The immunity is not automatic. The witness must explicitly claim his Fifth Amendment guarantee or it will be deemed waived. *United States v. Murdock,* 284 U.S. 141, 76 L. Ed. 210, 52 S. Ct. 63, 82 A.L.R. 1376 (1931). The court, not the witness, is the final judge of the validity of the claim. *Hoffman v. United States,* 341 U.S. 479, 95 L. Ed. 1118, 71 S. Ct. 814 (1951). Nor can the immunity be claimed by third parties. *Rogers v. United States,* 340 U.S. 367, 95 L. Ed. 344, 71 S. Ct. 438, 19 A.L.R.2d 378 (1951).

But the asserted hazard of self-incrimination must appear to be genuine; if fanciful or illusory, the claim of immunity should be rejected as insufficient to overcome the correlative duty to the court and litigants to testify to the truth. This means that the power to decide whether the hazards of self-incrimination are genuine and not merely illusory, speculative, contrived or false, must rest with the trial court before whom the witness is called to give evidence. The power to decide whether the witness shall be immune from answering certain questions put to him on the ground that the answers will incriminate him is thus vested in the trial court to be exercised in its sound discretion under all of the circumstances then present. *State v. James,* 36 Wn.2d 882, 221 P.2d 482 (1950); *Malloy v. Hogan,* 378 U.S. 1, 12 L. Ed. 2d 653, 84 S. Ct. 1489 (1964).

Although the defendant had entered a plea of guilty to the very charge of robbery for which accused was then on trial and presumably could not then be twice put in jeopardy for that precise offense, there were other circumstances present to support the exercise of judicial discretion in upholding his claim of Fifth Amendment immunity and the issue thus resolves down to whether in sustaining the claim of likely self-incriminating the court abused its discretion. When, having heard the testimony and seen the exhibits connected with the search of defendant's automobile the court heard the witness Drew, through his counsel,

claim the Fifth Amendment privilege for the stated reason that not only would he be liable to possible prosecution for a criminal conspiracy but more specifically for other crimes connected with the contents of the brown canvas "AWOL" bag, the court's sound discretion as to the validity of the claim was invoked. In sustaining it and declining to compel the witness to answer the questions to which he claimed the privilege, we find no abuse of the trial court's exercise of a sound discretion.

After the jury had received the case and deliberated for nearly 4 hours, it requested additional instructions and the court gave it the following:

> It is very desirable that you reach a verdict in this case. The law requires that your conclusion shall be unanimous. It is not required that any of you should surrender his or her individual freedom of judgment, but it is well that each of you should have in mind that your verdict cannot ordinarily be reached except by mutual consideration and discussion of all the different views that may suggest themselves to any of your number. The jury room is no place for pride of opinion. A verdict which is the result of real harmony, or that growing out of open-minded discussion between jurors, and a willingness to be convinced, with a proper regard for the opinions of others, and with a reasonable distrust of individual views not shared by their fellows, is a fair yielding of one reason to a stronger one. Such, having in mind the great desirability of unanimity, is not open to criticism. The law contemplates the jurors shall, by their discussions, harmonize their views, if possible, but not that they shall compromise with their consciences and yield for the mere purpose of agreement, nor that the minority shall necessarily yield to the majority.

Describing this as an "Allen-type" instruction from *Allen v. United States,* 164 U.S. 492, 501, 41 L. Ed. 528, 17 S. Ct. 154 (1896), defendant contends that additional instruction No. 1 contained the vices there alleged, but that here it constituted reversible error. We find no genuine parallel between the instruction given here and the one given in *Allen.* As noted in *United States v. Fioravanti,* 412 F.2d 407, 420 (3d Cir. 1969), one vice of the instruction in *Allen* is

that it admonished the supposed minority of the jury to see the error of its way, but did not apply the same thesis to the putative majority.

Under strikingly similar circumstances, this court approved the precise instruction now before us in *State v. Thomas*, 63 Wn.2d 59, 385 P.2d 532 (1963). There the jury had been deliberating for approximately 7 hours, had retired for the night, and the next morning were given the additional instruction. In sustaining the instruction, we said:

> It is the duty of the court to encourage the jury to agree. The law contemplates that the jurors shall harmonize their views, if possible, providing they do not compromise with their consciences and yield to the majority for the mere purpose of agreement. *State v. Ring*, 52 Wn. (2d) 423, 325 P. (2d) 730 (1958); *State v. Johnson*, 53 Wn. (2d) 666, 335 P. (2d) 809 (1959); *State v. Parks*, 56 Wn. (2d) 555, 354 P. (2d) 383 (1960).

Although then as now we found no prejudice to the defendant in the contents or manner in which it was given, we repeat that it would be a better practice "for such an instruction to be given at the time the other instructions are given in the case, to avoid the possibility of placing more emphasis on one instruction than on the others." But if such an instruction is properly drafted and does not reflect the judge's views as to the guilt or innocence of the accused, and contemplates that each juror may in the ultimate stand on and need not compromise his conscience nor surrender his convictions solely out of consideration for the views of his fellow jurors or to reach a verdict, and is generally uncoercive in character, an instruction that the juror should try to harmonize and give sincere consideration to the opinions of his fellow jurors is a decision to be made by the trial judge in his sound discretion, with regard to all of the other instructions in the case. *Sanders v. United States*, 415 F.2d 621 (5th Cir. 1969); *Posey v. United States*, 416 F.2d 545 (5th Cir. 1969); *United States v. Sawyers*, 423 F.2d 1335 (4th Cir. 1970).

Accordingly, if in a criminal case the court's charge to

the jury makes clear that the accused is entitled to the individual verdict of each juror, that the verdict must be unanimous, that no juror need surrender his convictions, that the court cannot and has not intended to comment upon the evidence, nor weigh the evidence or the credibility of the witnesses, and that the jury cannot return a verdict of guilty unless the defendant's guilt has been established to its satisfaction beyond reasonable doubt, and the presumption of innocence overcome, it is discretionary with the trial court whether the jury shall be instructed that each juror should give careful consideration to the views of his fellow jurors, and if possible without yielding his conscience, harmonize his views with those of the other jurors, that they shall, if possible, reach a verdict if they can conscientiously do so without compromising their convictions. *State v. Austin,* 136 Wash. 499, 240 P. 676 (1925); *State v. Bolen,* 142 Wash. 653, 254 P. 445 (1927); *Tacoma v. Kitchen,* 146 Wash. 583, 264 P. 12 (1928); *State v. Johnson,* 53 Wn.2d 666, 335 P.2d 809 (1959).

Affirmed.

HAMILTON, C.J., HUNTER, STAFFORD, and WRIGHT, JJ., concur.

FINLEY, J., concurs in the result.

ROSELLINI, J. (dissenting)—In my view, the giving of additional instruction No. 1 constituted prejudicial error, and a new trial should be ordered.

It is true that the United States Supreme Court has approved such an instruction. *Allen v. United States,* 164 U.S. 492, 41 L. Ed. 528, 17 S. Ct. 154 (1896). It also is true that this court has approved the giving of an "Allen" instruction. *State v. Thomas,* 63 Wn.2d 59, 385 P.2d 532 (1963). However, the practice of giving such instructions, obviously designed to "unhang" the jury, has not been free of criticism. In *United States v. Fioravanti,* 412 F.2d 407 (3d Cir. 1969), Judge Aldisert, speaking for the United States Court of Appeals for the Third Circuit, delivered a

thoughtful opinion pointing out the dangers involved in judicial interference with the jury's deliberations.

As the writer of that opinion observed, a juror who is admonished that he must vote according to his own conscience and at the same time is told that if he disagrees with the majority he must doubt his own wisdom, is thrust upon the horns of a dilemma. In escaping that dilemma, he cannot ignore the fact that the judge has indicated that he considers the majority to be right. Furthermore, the juror's attention, rather than being directed to the objective determination of the guilt or innocence of the accused, is turned upon himself in an agonizing appraisal of his own motives. It should not be surprising if a juror concludes that the law prefers that he be agreeable rather than that he be intellectually honest.

The instruction discourages free and open discussion because of its emphasis upon the desirability of reaching a unanimous decision. Particularly when it is given, as here, after the jury has been deliberating for a period of time, it stresses the interest of the court in receiving an *early* verdict. I do not see how it can fail to inhibit the jury's deliberations. It is not surprising that it has come to be characterized as a "dynamite charge," designed as it obviously is to blast a hung jury into a verdict.

In my opinion, if the giving of such an instruction is to be regarded as harmless error in any case, it should be only in a case where it was given as a part of the main charge. In that context it may go unnoticed and therefore do no harm. Frankly, though, I would prefer to see the practice of giving such instructions abolished. If the jury cannot agree, an agreement should not be forced by artificial means. Such a forced verdict is less than a fully deliberated verdict, and the seeds of injustice lie within it.

In this case, the evidence against the appellant was all circumstantial evidence. His defense was not entirely implausible. There is good reason to assume that the jury was beset by honest doubt when the additional instruction was given. It is not improbable that, acting in good faith upon

the apparent message contained in the instruction, the jurors abandoned their deliberations and agreed to accept the decision of the majority. Such a verdict is not the unanimous verdict contemplated by the constitution.

I would overrule *State v. Thomas, supra,* and would hold that the giving of an "Allen" instruction is prejudicial error, resulting in the denial of a fair trial. Upon this ground, I would reverse.

NEILL, J., concurs with ROSELLINI, J.